COUNTY OF SUFFOLK, a municipal corporation, Robert Alcorn, Christopher S. George, Fred Harrison, Peter Maniscalco, William P. Quinn, and Custom Extruders, Inc., Plaintiffs,

v.

LONG ISLAND LIGHTING COMPANY, Stone & Webster Engineering Company, Charles R. Pierce, Wilfred O. Uhl, Charles J. Davis, and Andrew W. Wofford, Defendants.

UNITED STATES of America ex rel. W. Gordon DICK and John P. Daly, Jr., Plaintiffs,

v.

LONG ISLAND LIGHTING COMPANY, Charles R. Pierce, Wilfred O. Uhl, Charles J. Davis, and Andrew W. Wofford, Defendants.

Nos. 87–CV–646 (JBW), 87–CV–2065 (JBW).

United States District Court, E.D. New York.

March 22, 1989.
As Amended April 14, 1989.

Hill, Betts & Nash by Bernard Persky, Kenneth F. McCallion, Gregory W. O'Neill, James W. Johnson and Lawrence P. Kolker, New York City, E. Thomas Boyle, County Atty. of Suffolk County, Hauppauge, N.Y., for plaintiff Suffolk County.

Vladeck, Waldman, Elias & Engelhard by Judith P. Vladeck, Karen Honeycutt and Julian Birnbaum, New York City, for Individual Ratepayer plaintiffs.

Bower & Gardner by James D. Harmon, Jr. and Michael Eng, New York City, for United States.

Farrell, Fritz, Caemmerer, Cleary, Barnosky & Armentano by George J. Farrell and Delores Fredrich, Uniondale, N.Y., Edward T. O'Brien, County Atty. of Nassau County, Mineola, N.Y., for intervenor County of Nassau.

Peter L. Zimroth, Corp. Counsel of City of New York (Peter Lehner, of counsel), New York City, for intervenor City of New York.

Reilly, Like & Schneider by Irving Like, Babylon, N.Y., Flower & Plotka by Edward Flower, Bay Shore, N.Y., for plaintiff Custom Extruders, Inc. and intervenors Business Ratepayer plaintiffs.

Marilyn A. Marlek, Bethpage, N.Y., Cahill, Gordon & Reindel by Charles A. Gilman, New York City, for intervenor Grumman Corp.

Leibowitz & Peterson by Ira Leibowitz, Garden City, N.Y., Parker, Chapin, Flatteau & Kimpl by Gary Neil Sazar, Jericho, N.Y., for intervenor Long Island Ass'n.

Lewis & Greer by Lou Lewis, Poughkeepsie, N.Y., for intervenor Shoreham–Wading River Central School Dist.

Shea & Gould by Michael Lesch, Ronald H. Alenstein and John G. Nicolich, New York City, for individual defendants.

Susan E. Silverman, Hicksville, N.Y., for defendant Long Island Lighting Co.

Mudge Rose Guthrie Alexander & Ferdon by Laurence V. Senn, Jr., New York City, for defendant Stone & Webster Engineering.

Robert Abrams, New York State Atty. General's Office, New York City.

AMENDED MEMORANDUM
AND ORDER

FAIRNESS OF CLASS SETTLEMENT

WEINSTEIN, District Judge:

## TABLE OF CONTENTS

I.  INTRODUCTION
II.  HEARINGS
III.  FAIRNESS DETERMINATION
   A.  SETTLEMENT TERMS

B. FAIRNESS FACTORS
  1. The Complexity, Expense and Probable Duration of the Litigation.
  2. The Reaction of the Class to the Settlement.
  3. The Stage of the Proceedings and the Amount of Discovery Completed.
  4. The Risks of Establishing Liability.
  5. The Risks of Establishing Damages.
  6. The Risks of Maintaining the Class Action at Trial.
  7. The Ability of the Defendant to Withstand a Greater Judgment.
  8. The Range of Reasonableness of the Settlement Fund in the Light of the Best Possible Recovery.
  9. The Reasonableness of the Settlement Fund in Light of the Attendant Risks of Litigation.
      a. Minimizing Rate Increases.
      b. Closing Shoreham.
C. ADDITIONAL FACTORS AND CLASS MEMBER OBJECTIONS
  1. The Sum to be Received is Not Certain.
  2. Subclasses are Needed.
  3. The Court Exercised Influence on the Terms of the Final Agreement.
  4. Members of the Class are Giving Up Their Rights to Appear Before the Public Service Commission.
  5. The Amount Set Aside for Attorneys' Fees is Too Large.
  6. The Parties Did Not See the Final Agreement Soon Enough.
  7. It is Unfair for Suffolk County Taxpayers Not to Reap the Benefits of the Settlement.
  8. The Public Should Not be Required to Subsidize Management and Shoreham Costs.
  9. The Future of Shoreham is Unclear.
  10. A Citizens Advisory Panel Should Be Established.
  11. Conservation is Required.
D. UNITED STATES
E. STONE & WEBSTER ENGINEERING CORP.
F. SUMMARY OF REASONS FOR APPROVAL

IV. CONCLUSION

EXHIBITS:

Exhibit 1 — Final RICO Settlement Agreement dated February 27, 1989
    Appendix A — February 14 Agreement
    Appendix B — Agreement with Stone & Webster Engineering Corporation
    Appendix C — Instructions and Proof of Claim Form
    Appendix D — Proof of Claim of the United States of America
    Appendix E — Summary Notice of Partial Settlement of Class Action
    Appendix F — Final Judgment and Order of Dismissal of RICO Class Action [omitted]
    Appendix G — Final Judgment and Order of Dismissal of False Claims Action [omitted]
Exhibit 2 — Governor's Press Release and Agreement dated February 28, 1989 [Press Release omitted]

---

## I. INTRODUCTION

This case involves the economic well being and the health of millions of people and thousands of businesses dependent upon the Long Island Lighting Company (LILCO) for electric power. It raises profound issues of federalism, of public utility regulation and of the reach in civil litigation of a revolutionary statute designed to bring to justice racketeers under the Racketeer Influenced and Corrupt Organization Act (RICO), 18 U.S.C. §§ 1961 *et seq.* It implicates serious political struggles of New York State and Suffolk County legislators and of a Governor and County Executive as well as of town and school district

officials. It brings to the surface private agendas for publicly owned power and deep antipathy towards large corporations, particularly utilities. It has elements of xenophobia and hysteria. It reflects a deep populist strain of our citizens and an urge to stand up for what they believe in, to speak out on public issues and to be heard by public officials. Stronger than the other rational and emotional aspects of the case is a pervasive fear of atomic energy generally and the Shoreham Nuclear Power Station (Shoreham) in particular; if there was one overriding theme of plaintiffs in the case it was that Shoreham must close. To understand this case is to appreciate that money alone and an economic theory of litigation do not fully explain the dynamics of mass tort litigation.

The exhausting, debilitating and costly years of hostility, misunderstanding and poor judgments about Shoreham need to be put behind the parties. There are no absolutes, no clearly right or wrong way to end the dispute. All that is crystal clear and indisputable is that the controversy must be ended as soon as possible.

Claims are asserted under the RICO statute against LILCO by a class of over one million of the utility's past and present ratepayers. Prior opinions, memoranda and orders have described the litigation in detail. *See County of Suffolk v. Long Island Lighting Co.*, 685 F.Supp. 38 (E.D.N.Y.1988) (denying motion to dismiss); 710 F.Supp. 1405 (E.D.N.Y.1989) (discussing class certification issues); 710 F.Supp. 1406 (E.D.N.Y.1989) (concerning hearing and briefing schedules); 710 F.Supp. 1387 (E.D.N.Y.1989) (dismissing RICO claims of Suffolk County after a trial at which Suffolk obtained a verdict in its favor); 710 F.Supp. 1407 (E.D.N.Y.1989) (certifying class and appointing class counsel). *See also* 710 F.Supp. 1477 (E.D.N.Y.1989) (ordering distribution of attorneys' fees); *United States ex rel. Dick and Daly*, 710 F.Supp. 1485 (E.D.N.Y.1989) (dismissing False Claims Act claims of qui tam plaintiffs).

On February 15, 1989, hearings were ordered to determine whether the terms for settlement of this action, reached with the assistance of the court-appointed mediator, Kenneth R. Feinberg, Esq., and agreed to by the class representative and the defendants, were fair and reasonable. *See* 710 F.Supp. 1422 (E.D.N.Y.1989). The final settlement agreement entered into on February 27, 1989 is attached as exhibit 1 to this memorandum. By the February 15 order the court directed that notice of the hearings be provided to class members. Notice was given by direct mail to almost one million customers of LILCO, by advertising in daily and weekly newspapers, and by news stories carried extensively in the press and by radio and television.

## II. HEARINGS

Two hearings, on March 1 and March 9, were conducted in the ceremonial courtroom in the main courthouse in Brooklyn with seating for 500 persons; one on March 8th in the Uniondale, Nassau County, courthouse with seating for 175 persons; and one on March 3rd in the Hauppauge, Suffolk County courthouse, with one courtroom equipped for 150 persons and another, where the proceedings were piped in, with 100 seats for an overflow of attendees. Hundreds of people appeared at the hearings and many of them spoke. Additional time was afforded for briefing. A substantial number of letters from ratepayers were received.

Hearings are mandated by Rule 23(e) of the Federal Rules of Civil Procedure, which reads:

> *(e) Dismissal or Compromise.* A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

Those affected by the settlement must be given the best notice practicable and a full

opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Members of the class require "a full and fair opportunity to consider the proposed decree and develop a response." *Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir.1983).

Hearings and review by the court are designed to satisfy four needs: First, they afford any person whose rights might be affected an opportunity to support or oppose the settlement; silence may, depending on the circumstances, be deemed assent. Second, they prevent private deals for the benefit of lawyers or special groups contrary to the best interests of the class. Third, they protect the rights of those whose interests have not been adequately considered by the parties. Fourth, they assure each class member that the right to be heard by the court on matters of vital personal interest has not been violated by others who speak without consultation and consent. *See, generally, In re "Agent Orange" Product Liab. Litig.*, 597 F.Supp. 740, 758 (E.D.N.Y.1984), *aff'd.*, 818 F.2d 145 (2d Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988) (and authorities there cited). The court acts "as a guardian of the rights of absent class members." *Grunin v. International House of Pancakes*, 513 F.2d 114, 123 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975).

Notice and the opportunity to be heard fully complied with legal standards. The court was able to exercise its responsibilities to protect the class.

## III.   FAIRNESS DETERMINATION

We set out first, as a basis for discussion, a description of the settlement. This is followed by a summary of arguments of counsel and experts for the class supporting the agreement. Following that is a description of the nine elements that must be considered by the court in the fairness inquiry, with the most extensive discussion devoted to comments of those opposing the settlement. This commentary is succeeded by analysis of a variety of other factors the court considered as a result of the hearings, with major emphasis on the issue of closing Shoreham. Finally, there is a summary of the decision of the court approving settlement after interpreting some of the terms of the agreement.

## A.   SETTLEMENT TERMS

The settlement consists of five main elements: 1) a schedule of payments to the class over an eleven year period, with limited power of the court to defer or accelerate payments upon application by a party; 2) a fund of up to ten million dollars for legal and related costs; 3) organization of a Citizens Advisory Panel to assist the class and LILCO over the next five years, which is interpreted by the court to permit extension until all payments are made (with availability of portions of the $10 million legal fee fund for aid of the panel as permitted by the court); 4) releases which give up class members' rights to sue on the present RICO claims in state or federal courts, which, as interpreted by the court, permit any member of the class to complain to the New York Public Service Commission (PSC); and 5) provisions ensuring that the payments to the class will not be recovered by LILCO through rate increases.

The schedule of payments is as follows:

Immediately—Up to $10 million for legal fees and expenses.
June 1990—$20 million (up to $10 million of this sum to go to former ratepayers)
June 1991—$20 million
June 1992—$20 million
June 1993—$30 million
June 1994—$30 million
June 1995—$40 million
June 1996—$50 million
June 1997—$60 million
June 1998—$60 million
June 1999—$60 million

At the fairness hearings a fully qualified and credible expert for the class testified that the settlement was fair and reasonable if Shoreham closed. He relied upon his own studies and the computations by experts on the staff of the PSC. The PSC's conclusion was that the total agreed to be paid by LILCO spread over ten years was the largest sum that could be paid without having an adverse impact on ratepayers as well as LILCO.

Plaintiff's expert described a "boomerang effect." He was of the opinion that higher payments in the RICO settlement would present a serious danger to LILCO by threatening investor confidence in the financial health of the utility. This would lead to higher interest rates if LILCO's bonds were not certified as of investment quality. The higher interest rates would, in turn, under standard PSC practice, be charged back to ratepayers as allowable utility costs. These additional costs would then, the experts for the PSC concluded, more than outweigh any increased level of payments above the schedule set out above. An expert called as a witness by one of the intervenors testified that in his opinion LILCO could make higher payments without creating a "boomerang effect." His testimony was contradicted by more credible information in the record, was based upon a superficial analysis, and is rejected as unreliable and not credible.

■ There is some dispute about how many of the original named plaintiffs support and how many oppose the settlement. It was these plaintiffs who, on recommendation of counsel for Suffolk County, retained Judith Vladeck, Esq., as their counsel to represent the class. Ms. Vladeck, a highly qualified attorney, was thereafter designated by the court to represent the class. At the hearings some of these plaintiffs opposed the settlement. Others of these named plaintiffs supported the settlement. Some appeared to be *dubitante*. Ms. Vladeck's affidavit suggests that a minority of the named plaintiffs are opposed.

Like her, the majority will be satisfied with the settlement only if Shoreham is closed. In any event, Ms. Vladeck has represented the entire class, not merely her original clients, from the time the class was certified and she was designated class counsel.

"Class counsel's duty to the class as a whole frequently diverges from the opinion of either the named plaintiff or other objectors." *Walsh v. Great Atl. & Pac. Tea Co.*, 726 F.2d 956, 964 (3rd Cir.1983). *See also Parker v. Anderson*, 667 F.2d 1204, 1210–11 (5th Cir.), *cert. denied*, 459 U.S. 828, 103 S.Ct. 63, 74 L.Ed.2d 65 (1982) (consent decree in class action upheld despite objections of a named party and class representative). *Parker v. Anderson* is a leading case on this issue. In *Parker*, the court of appeals affirmed the approval of a class action settlement "granted over the objection of all but one of the eleven named plaintiffs as well as over the objections of a number of class plaintiffs." *Id.* at 1207. Rejecting the contention that class counsel did not fairly and adequately represent the class during negotiations, the court wrote:

> The duty owed to the client sharply distinguishes litigation on behalf of one or more individuals and litigation on behalf of a class. Objectors emphasize the duty of counsel in non-class litigation. The prevailing principles in that situation cannot be imported wholesale into a class action setting. The fairness and adequacy of counsel's performance cannot be gauged in terms of the representation of the named plaintiffs.
>
> The courts have recognized that the duty owed by class counsel is to the entire class and is not dependent on the special desires of the named plaintiffs. It has been held that agreement of the named plaintiffs is not essential to approval of a settlement which the trial court finds to be fair and reasonable.

*Id.* at 1211.

Similarly, in *Kincade v. General Tire and Rubber Co.*, 635 F.2d 501, 508 (5th

Cir.1981), the court rejected the contention that the settlement could not be applied to named class representatives who did not authorize their attorneys to approve the settlement:

> Appellants' argument that the settlement cannot be applied to them because they did not authorize their attorney ... to settle the case or otherwise consent to the settlement is also easily disposed of. Because the "client" in a class action consists of numerous unnamed class members as well as the representatives, and because "[t]he class itself often speaks in several voices ...., it may be impossible for the class attorney to do more than act in what he believes to be the best interests of the class as a whole...." *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1216 (5th Cir.1978).

*See also, e.g., Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); *Flinn v. FMC Corp.,* 528 F.2d 1169, 1174 n. 19 (4th Cir.1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976) ("Appellants do not argue, nor may they under the authorities, that the assent of the class plaintiffs is essential to the settlement, provided the trial court finds it fair and reasonable"); *Bryan v. Pittsburgh Plate Glass Co.,* 494 F.2d 799 (3d Cir.), *cert. denied,* 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974); *Purcell v. Keane,* 54 F.R.D. 455 (E.D.Pa. 1972).

As the Court of Appeals for the Fifth Circuit has pointed out:

> Certainly it is inappropriate to import the traditional understanding of the attorney-client relationship into the class action context by simply substituting the named plaintiffs as the client.... Were the class attorney to treat the named plaintiff as the exclusive client, the interests of other class members might go unnoticed and unrepresented. Thus, when a potential conflict arises between the named plaintiffs and the rest of the class, the class attorney must not allow decisions on behalf of the class to rest exclusively with the named plaintiffs.

*Pettway v. American Cast Iron Pipe Co.,* 576 F.2d at 1176. The unusual conditions surrounding settlement of a non-class action suit, in which each party has determined for itself that settlement is preferable to going forward, cannot be replicated in a class situation:

> Class actions are premised on the impracticability of joining all parties in the suit. Individual members are represented in settlement as in all other phases of the litigation by counsel to the representative parties. Few members of the class know "their" counsel or have any special reason to have confidence in them. Those class members must, in the ultimate analysis, depend upon the court's impartiality and judgment.

*In re "Agent Orange" Prod. Liab. Litig.,* 597 F.Supp. at 761 (citations omitted).

The court in *Parker* explained that class representatives, who may have individual interests that conflict with the interests of the class as a whole, may not block a settlement that is fair and reasonable for the class:

> [T]he named plaintiffs should not be permitted to hold the absentee class hostage by refusing to assent to an otherwise fair and adequate settlement in order to secure their individual elements.

667 F.2d at 1211. This rule is particularly appropriate here, where the objecting named plaintiffs are long-time anti-Shoreham and anti-LILCO activists with interests and political goals that may be antagonistic to the interests of the ratepaying class as a whole. In light of her fiduciary responsibility to the class, counsel was under a duty to ignore any special interests of the objecting class representatives in favor of the overall, general interests of the class as a whole.

In these circumstances, the comments of the court of appeals in *Salinas v. Roadway Express Inc.,* 802 F.2d 787, 790 (5th Cir. 1986), *cert. denied,* 479 U.S. 1103, 107 S.Ct. 1335, 94 L.Ed.2d 185 (1987), are particularly appropriate:

> While we appreciate and sympathize with the individual complaints and concerns

expressed by the objectors, we remind the objectors and all other parties that a consent decree is a compromise that cannot possible satisfy every class member's particular desires; rather, the decree must embody the best settlement available to the class as a whole. This record indicates that gains reached during the settlement could have been delayed, jeopardized or even lost entirely if litigation had continued. Thus, compromises here were fully justified so as not to gamble with the rights of everybody to satisfy the complaints of some.

Moreover, as the court pointed out in *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 462 (2d Cir.1982),

[M]ajority opposition to a settlement cannot serve as an automatic bar to a settlement that a district judge, after weighing all the strengths and weaknesses of a case and the risks of litigation, determines to be manifestly reasonable.

The court further noted that "although relevant, the non-opt-out nature of a class does not give a majority-in-interest an absolute veto of any settlement." *Id.*, 675 F.2d at 463, n. 7.

## B. FAIRNESS FACTORS

The settlement must be fair, reasonable and adequate in the light of all the circumstances, including the public interest in settling controversies. *Carson v. American Brands*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981); *West Virginia v. Chas Pfizer & Co.*, 440 F.2d 1079, 1085 (2d Cir.), *cert. denied*, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). *See also, e.g., Thompson v. Midwest Foundation Independent Physicians Ass'n*, 124 F.R.D. 154 (S.D.Oh.1988) (approving settlement of large RICO case because of the paucity of evidence and the need to provide medical services to 100,000 subscribers).

■ Because the class representatives and their counsel, Ms. Vladeck, were engaged in settlement negotiations prior to certification of the class, the court previously indicated that it would exercise a "heightened responsibility" to review the settlement. *See* 710 F.Supp. 1422 (E.D.N.Y.1989). "The possibilities of collusion or undue pressure by the defendants on would-be class representatives" make necessary a closer scrutiny when settlement is reached prior to certification of the class. *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir.1982), *cert. denied*, 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). Thus the Second Circuit requires a "clearer showing of a [pre-certification] settlement's fairness, reasonableness and adequacy and the propriety of the negotiations leading to it. . . ." *Id.*

Here, although the class was certified before the proposed settlement was reached, the court will apply the heightened standard of *Weinberger* to satisfy itself that the settlement is the best possible one that could be obtained by the class under the circumstances. There is nothing to indicate that the settlement process itself was tainted by collusion or undue pressure by the defendants upon class representatives and counsel. Prior to certification of the class, the court was informed by the parties on a regular basis of the progress of settlement talks. Both sides were possessed of formidable negotiating skills and significant bargaining power, and negotiations were conducted at arm's length. The court observed nothing to suggest otherwise. Additionally, an impartial mediator was appointed by the court at the request of the parties to assist in the settlement discussions. The participation of the court-appointed mediator in the negotiating process helped ensure that the proceedings were free of collusion or undue pressure.

■ As demonstrated at greater length in *In re "Agent Orange" Product Liab. Litig.*, 597 F.Supp. at 761 ff. and *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974), the nine factors the court should consider in deciding whether to approve the settlement are:

1. *The Complexity, Expense and Probable Duration of the Litigation.*

To date the dispute between Suffolk County and LILCO which culminated in this RICO case has generated at least some

70 million dollars in legal fees and costs. It has been reported that through January, 1989, the County alone has contracted for more than 35 million dollars in legal and related costs—paid, of course, by Suffolk taxpayers—and doubtless LILCO has expended a similar amount. *See* Newsday, Feb. 21, 1989, at 7, col. 3, and 25, col. 1. The RICO case itself has, according to Suffolk County, cost taxpayers some 7.5 million dollars in fees and at least that amount has probably been expended by LILCO. Certain of LILCO's fees are passed on to ratepayers as business expenses. Further litigation will lead to many millions of dollars in added expenses, benefiting lawyers, to the detriment of taxpayers and ratepayers.

### 2. The Reaction of the Class to the Settlement.

The court was impressed with the sincerity and good faith of those who communicated with the court. The beliefs of ratepayers who opposed as well as those who supported the settlement were deeply held.

The sentiments of those who addressed the court were divided. Most of those who participated in the fairness hearings or who filed written submissions with the court expressed negative feelings about the settlement. This group was, however, but a minor fraction (much less than 1/10 of 1%) of the total class of ratepayers. The silence of the overwhelming majority does not necessarily indicate that the class as a whole supports the proposed settlement, but silence certainly cannot be equated with opposition. *See Traffic Executive Ass'n— Eastern R.Rs. v. Long Island R.R.*, 627 F.2d 631, 634 (2d Cir.1980).

As noted above, opposition to a class settlement—even by a majority of the class—is not a bar to court approval if the settlement is fair. *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir.1987). Even express opposition by more than half the class does not demonstrate that the settlement is unfair, nor that court approval should be withheld. *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 458 (2d Cir.1982). As the Second Circuit has

explained, preventing a settlement that a district court properly determines to be fair and reasonable solely because of majority opposition "not only deprives other class members of the benefits of a manifestly fair settlement and subjects them to the uncertainties of litigation, but ... [may] result[ ] in the eventual disappointment of the objecting class members as well." *Id.* at 462–63.

A "democratic vote," suggested by one of the objectors at the fairness hearings, would be virtually impossible since the costs of ensuring that each member of the class fully understood the issues bearing on the settlement before voting would be prohibitive—particularly in view of the intense hostility of ratepayers toward LILCO. *See In re "Agent Orange" Prod. Liab. Litig.*, 597 F.Supp. 740; *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 23 (2d Cir.1987).

The court acts as a fiduciary to guard the rights of all class members. *Percodani v. Riker–Maxson Corp.*, 50 F.R.D. 473, 478 (S.D.N.Y.1970), *aff'd sub nom. Farber v. Riker–Maxson Corp.*, 442 F.2d 457 (2d Cir.1971).

> [T]he mere fact that the only class members expressing opinions regarding the settlement were a vocal minority opposing it does not alter the district court's discretion in approving the settlement or its duty to protect the interests of the silent class majority.... We perceive no reason why a settlement cannot be considered fair despite opposition from all who responded when the responding class members were significantly less than half the class.

*Grant v. Bethlehem Steel Corp.*, 823 F.2d at 23–24. *See also TBK Partners Ltd. v. Western Union Corp.*, 675 F.2d at 462.

Many, if not most, of those objecting to the settlement opposed it for reasons having no direct bearing on the reasonableness of the RICO suit agreement. Instead, the objections were grounded in other well-intentioned but legally irrelevant concerns. For example, most of those who communicated with the court had Shoreham's closing on their minds.

Information gleaned at the hearing as well as various public opinion polls, referred to below, make it clear that the majority of people in Nassau and Suffolk are opposed to the operation of the Shoreham Nuclear plant. Most understand that the closing of the plant might lead to higher rates and loss of taxes to Suffolk County, Brookhaven Township and local muncipalities in which the plant is located. They would prefer to shift as much of the cost of closing Shoreham as possible to LILCO and its shareholders. In their minds the RICO case and the Shoreham controversy are closely related and they see the RICO litigation as providing a mechanism for placing Shoreham's costs on LILCO's shareholders. Fear that Shoreham might open permeated the hearings. This issue is discussed at greater length below.

■ Some of those who opposed the settlement did not understand why, once the jury had ruled, the court could set aside the verdict. It is likely their objection rested on the belief that the court had overturned the factual findings of the jury. That was not the case. The court's dismissal of Suffolk's claims rested on the legal theory that the RICO statute did not apply to the County's claims. *See* 710 F.Supp. 1387 (E.D.N.Y.1989). Questions of law such as these are solely the province of the court.

Where, as here, novel and complex legal questions are involved, it is sound practice to provide a full development of the record, including decision by a jury, before ruling on the law. *See, e.g.,* 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2725, p. 85 ("resolution of complex questions of law frequently requires a more concrete factual development than may be obtained through summary proceedings"); *id.,* § 2732 (describing evolution of "notion that summary judgment may not be appropriate in complicated and important litigation"); *Kennedy v. Silas Mason Co.,* 334 U.S. 249, 256, 68 S.Ct. 1031, 1034, 92 L.Ed. 1347 (1948) ("summary procedures, however salutory where issues are clear-cut and simple, present a treacherous record for deciding issues of farflung

import, on which this Court should draw inferences with caution from complicated courses of legislation ... and practice"). This approach is especially encouraged where complex and important issues of a constitutional dimension are raised. *See Felix v. Young,* 536 F.2d 1126, 1135 (6th Cir.1976). The practice avoids the need for a retrial should there be a reversal on the law, and therefore rests in part on concerns of judicial economy and efficiency. This objection, although understandable from a layperson's point of view, is untenable as a matter of law.

Other objectors were interested in public ownership and operation of LILCO. They believed that forcing LILCO into bankruptcy might reduce the cost of purchase or condemnation of LILCO's property. Any bankruptcy proceedings would be conducted in this court. It is not at all clear what the effect of bankruptcy would be since the bankruptcy judge might have power to raise rates immediately to make LILCO profitable. *See, e.g.,* M.L. Wald, "Seabrook Utility in a Battle Over Who Regulates Rates," N.Y. Times, Feb. 28, 1989, Business Section, p. 1, col. 1. Moreover, the PSC has firmly opposed the bankruptcy option. In its report supporting the Governor's proposed settlement, the staff of the PSC observed that "the chaos and uncertainty resulting from a bankruptcy ... compels rejection of bankruptcy as a viable alternative." State of New York, Public Service Commission, Cases 29484 and 88–E–084, Staff's Initial Brief Supporting the Settlement, August 9, 1988, at 9. In any event, attorneys, accountants, consultants and others would earn additional huge fees in any bankruptcy proceeding without a gain, and with the serious possibility of a loss in efficiency—all to the detriment of ratepayers and taxpayers.

The fact that the settlement will probably result in a financially viable LILCO is not a basis for rejecting the settlement. The ability of the defendant to pay a judgment is a critical factor in settlement. As the Second Circuit has explained:

Common sense seems to dictate the necessity, to say nothing of the propriety,

of such a consideration.... According to the United States Supreme Court: "Further, the judge should form an educated estimate of ... *the possible difficulties of collecting on any judgment which might be obtained,* and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Protective Committee v. Anderson,* ... [390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163–64, 20 L.Ed.2d 1 (1968).] *City of Detroit v. Grinnell Corp.,* 495 F.2d at 467 (emphasis in original). *See also City of Detroit v. Grinnell Corp.,* 356 F.Supp. 1380, 1389 (S.D.N.Y.1972), *aff'd* in part and *rev'd* in part, 495 F.2d 448 (2d Cir.1974) ("the prospect of a bankrupt judgment debtor at the end of the road does not satisfy anyone involved in the use of class action procedures"); *Grunin v. International House of Pancakes,* 513 F.2d at 119, 124–25; *In re Federal Skywalk Cases,* 97 F.R.D. 380, 387, 389 (W.D.Mo.1983).

Most importantly, a large proportion of objectors had been leaders in the fight to block the opening of Shoreham. Some from the east end of Suffolk County objected to those they described as outsiders taking part in a struggle to which the leaders had devoted so much time and effort. Thus, derogatory remarks were made at the hearing in Hauppauge about "outsiders" participating in the litigation—including references to a judge from Brooklyn and an attorney for the class and mediator from New York—who could not be aware of the long struggle to close Shoreham. This devoted band which so passionately opposes nuclear power cannot control the resolution of this case when millions of people served by LILCO may have interests not necessarily congruent with theirs. Generals in a war are not necessarily those best able to make the decisions that are required if hopes for peace are to be realized.

Many of those who objected compared the total settlement figure—400 million dollars, including attorneys' fees, payable over more than ten years—with the total possible judgment on behalf of the class—some 10 billion dollars—and found it wanting. This attitude is understandable but, as indi-

cated below, it fails to take into account the probabilities of success and of collection.

Given the risks of prevailing on appeal, and ultimately on the merits, the settlement providing for $390 million in rate reductions and refunds is well within the range of reasonableness. *See In re "Agent Orange" Prod. Liab. Litig.,* 597 F.Supp. at 762; *Flinn v. FMC Corp.,* 528 F.2d 1169, 1172–73 (4th Cir.1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976). Although this is not such a case, "[t]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery." *City of Detroit v. Grinnell Corp.,* 495 F.2d at 455 n. 2. *See also TBK Partners Ltd. v. Western Union Corporation,* 675 F.2d at 463–64; *Parker v. Anderson,* 667 F.2d at 1210 n. 6.

The settlement fund is not as grossly disproportionate to the best possible recovery as some objectors suggested. The amount should be balanced against the potential actual damages possible with continued litigation, not against the trebled damages available under the provisions of RICO. As the Second Circuit noted, "there are strong reasons why trebling is improper when computing a base recovery figure which will be used to measure the adequacy of a settlement offer." *City of Detroit v. Grinnell Corp.,* 495 F.2d at 458. The Court of Appeals' reasoning in the *Grinnell* case, an action for treble damages under the Clayton Act, applies with equal force to the instant case brought under RICO:

[T]o argue that treble damages ought to be considered in a calculation of a base recovery range is to distort the entire theoretical foundation which underlies the settlement process. It requires defendants to admit their guilt for the purpose of settlement negotiations. One of the underlying premises on which such negotiations are based, however, is that defendants never have to concede their guilt.... To require ... defendants automatically to concede guilt at the outset of negotiations ... would upset the del-

icate settlement balance by giving too great an advantage to the claimants—an advantage that is not required by [the law] and on which might well hinder the highly favored practice of settlement.

*Id.* at 459.

Some of those who objected were bitter over LILCO's alleged poor service to them and others over the years. They felt they had been abused and cheated by high rates. Almost no utility has the affection of all those it serves no matter how many advertising dollars are spent in an effort to portray the company as a warm and caring friend. Nevertheless, this antipathy to LILCO—based as it is on factors other than the RICO suit—cannot be permitted to carry the day for those who oppose settlement.

Other objectors felt that LILCO could not be trusted to carry out the settlement. Some of them expressed a low opinion of the PSC and its ability to avoid being "captured" by the utility to the detriment of the class. There is, of course, always a possibility that the terms of the settlement will not be carried out. As indicated below, however, adequate steps have been taken to protect the class.

A number of objectors, particularly the lawyers for various intervenors, were upset that they had not fully participated in settlement negotiations. Both the February 13 and February 15 orders make clear the legal basis for limiting intervenors' participation in negotiations. Almost any major litigation of this kind, particularly one with strong emotional, political and important economic consequences, is settled only after private negotiations among the leading parties. Settlement of disputes could not in many instances take place without some private negotiations. The interests of those who have not participated in the negotiation process are protected by their right to be heard at public hearings after a tentative settlement is reached.

*Vulcan Society v. Fire Department,* 20 E.P.D. (CCH) ¶ 30,131, 1979 WL 259 (S.D. N.Y.1979) illustrates this point. In a class action race-discrimination case, the trial judge denied a motion by intervenor unions to require other parties to allow the unions to participate in ongoing settlement negotiations. Denying the motion, the court recognized that (a) parties "cannot be prevented from negotiating on their own"; (b) "negotiations must be confidential to have any chance of succeeding"; (c) "intervenors' participation" would only tend to complicate the negotiations, both on substantive matters and in terms of management; and (d) "any rule that entitled intervenors to participate in negotiations between the other parties to a litigation would ultimately act as a constraint on the right to intervene." Because *Vulcan Society,* like this case, was a class action, the court recognized that "intervenors' interests will be fully protected, since they will be entitled to object to any settlement ultimately proposed."

It has been contended by some that the schedule of fairness hearings gave class members insufficient time to analyze the settlement and prepare objections. Given the interrelation of the settlement discussions with other factors, such as ongoing "global" settlement hearings in Albany and licensing of Shoreham hearings in Washington, it cannot be said that this objection is well founded.

What constitutes a reasonable time varies from case to case. The manner of giving notice and its timing are left to the discretion of the trial court by Rule 23(e). *In re "Agent Orange" Prod. Liab. Litig.,* 597 F.Supp. at 759. In *Grunin v. International House of Pancakes,* 513 F.2d at 121, notice was given only nineteen days before the fairness hearing. Here, notice was ordered on February 15th, twenty-two days before the final fairness hearing at which members of the class could voice their objections, and the settlement and its terms were extensively reported in the press and other news media the day before. LILCO mailed individual notices concerning the settlement terms and hearing dates to its approximately one million customers over the period February 17 to February 21, 1989.

Moreover, it is misleading to characterize the notice period as confined exclusively to

those 22 days between formal court-ordered class notice and the final fairness hearing. While some intervenors were nowhere to be seen until shortly before the settlement notice went out to the class, other class members had been engaged in the ongoing litigation with LILCO for the previous two years. Such pre-notice participation is a "highly relevant" consideration in evaluating claims of violation of Rule 23 and the dictates of due process. *Grunin v. International House of Pancakes*, 513 F.2d at 121.

A hearing was conducted at least once at each of the three courthouses in the district. All of those who wished to be heard were heard orally or in writing. The court stayed in session into the evening hours to enable those who worked to attend. Experts testified for and against the settlement and anyone was permitted to cross-examine them. The issues were fully briefed by the attorneys.

The hearings were held after a two month trial where extensive evidence was introduced, full briefs were filed and many rulings of the court docketed. Extensive discussion in the press provided an unusual opportunity for those interested to become aware of the issues.

Seldom has there been as extensive an opportunity to be heard at Rule 23 hearings. The argument that the hearings were inadequate is untenable.

In considering the sequence of hearings it must be recognized that many other bodies and persons had given public indication that they were awaiting some action in the RICO suit with the hope that a "global" settlement could be reached, sealing the fate of Shoreham, providing some protection for ratepayers and LILCO, and furnishing a basis for a peaceful future in power generation and distribution on Long Island. As a practical matter, relevant events in Albany and elsewhere were dependent on the prompt resolution of the RICO suit. The Governor and LILCO were, simultaneously with the settlement negotiations in this case, arranging for Shoreham's closing and deciding ratemaking issues. Aspects of the Governor's ac-

tivities implicated the PSC and other state agencies. *See* Exhibit 2 attached. The PSC itself was in the process of granting LILCO a temporary rate increase conditioned on the temporary closing of Shoreham. The Nuclear Regulatory Commission (NRC) was about to license Shoreham for commercial power production.

Simultaneously with the above state and national events, the Suffolk County legislature was itself concerned not only with the continuing issue of closing Shoreham but with settling a tax certiori suit against the town of Brookhaven for upwards of $500 million dollars—with an exposure to the County of a potential liability in the hundreds of millions of dollars—based on claims by LILCO that its real property taxes were too high. Reducing LILCO's real estate taxes in Suffolk County means reduced expenses and rates to all ratepayers, including those in Nassau and Queens. Resolution of this tax certiorari suit in favor of LILCO may have a beneficial impact on ratepayers outside the county, whose interests may therefore be adverse to those of Suffolk County taxpayers. Given this congeries of issues, a prompt decision to settle the RICO suit was an essential prerequisite to overcoming paralysis in dealing with Shoreham and to disposing of a series of interrelated issues to the benefit of ratepayers, opponents of Shoreham, and taxpayers.

A number of people support Shoreham's opening. They opposed settling because termination of the RICO case might prevent the opening of Shoreham. Though a minority, this group believed that future power needs on Long Island would require Shoreham, particularly if the price of oil from overseas (where almost all of LILCO's fuel originates) continues to rise. Some in this group were LILCO shareholders who were also ratepayers. Some businesses were apparently of this view, although they tended to oppose the settlement on less controversial procedural grounds.

In short, much of the opposition to the settlement focused on private agendas in-

dependent of the merits of the RICO suit. This opposition cannot be dispositive.

### 3. *The Stage of the Proceedings and the Amount of Discovery Completed.*

There has been a full trial after extensive discovery. LILCO and Suffolk County presented their information and arguments over a two month period. The transcript, including those at the fairness hearings, totalled over 7800 pages. Briefs and exhibits would almost fill a substantial room. There are well over 600 docket entries. It is unlikely that any significant information has been left unrevealed.

### 4. *The Risks of Establishing Liability.*

This court's memorandum and order, 710 F.Supp. 1387 (E.D.N.Y.1989), dismissing the complaint of Suffolk County, established that as a matter of law there is no basis for the class complaint. Stare decisis makes that decision the law of the case, binding on the class unless it is reversed on appeal. Even if the court's decision that RICO does not apply to this rate-making dispute is overturned on appeal there are three other substantial bases for a dismissal of the action: First, the doctrine of primary jurisdiction mandates the deferral to the PSC of factual issues raised by Suffolk's claims. Second, abstention doctrines require that the court not act; the court has determined that preemption does not overcome the doctrine of abstention. *Cf.* Note, The Preemption Dimension of Abstention, 89 Colum.L.Rev. 310 (1989). And, third, failures of proof require setting aside the jury's verdict. Each of these grounds is substantial. They are adverted to in the court's earlier oral and written decisions. In combination they substantially reduce the probability of success on appeal.

### 5. *The Risks of Establishing Damages.*

The amount of damages could be readily extrapolated to the class were the verdict by Suffolk County against LILCO to be upheld. The class might be entitled to further damages were it to prevail on those claims not established by Suffolk County. They, too could be readily established by computation.

### 6. *The Risks of Maintaining the Class Action at Trial.*

Were there a legal basis for the RICO claim, which there is not, the class could take advantage of the doctrine of collateral estoppel to rely on the case made by Suffolk County in its RICO trial. A further trial to establish the contentions lost by Suffolk County could then be sought by the class since it would not be bound by collateral estoppel, not having had a due process opportunity to establish its claims. This second phase trial would be before another jury, would last at least a month and would cost several million dollars in legal fees. Appeals would add to these fees. As noted in 4 above, the chances of success are poor.

### 7. *The Ability of the Defendant to Withstand a Greater Judgment.*

The cost of the settlement to LILCO is approximately 400 million dollars payable over eleven years, or slightly over 200 million dollars in present value. During negotiations the PSC calculated that this is the maximum that can be paid by LILCO if it is to regain financial health. The hearings established that it was the PSC staff which provided this figure based on its expertise. The court finds this conclusion sufficiently established to warrant accepting it as a basis for the settlement.

LILCO's present equity is under 4 billion dollars. Damages to the class extrapolated from the first trial phase—the litigation by Suffolk County—are over 4 billion dollars. Maximum damages for the possible second phase trial by the class, when added to first phase damages, would be in the order 10 billion dollars.

Full damages after either the first or second phase trials would bankrupt LILCO. It is not clear how much damages could be recovered during bankruptcy or what the cost to ratepayers of bankruptcy would be. As already indicated, it is not clear whether the Bankruptcy Court would fix rates and

whether they would be higher than those fixed by the PSC. It appears likely that the benefits to the class upon bankruptcy would be considerably less than the maximum possible recovery under either trial phase one or two. Whether the class would receive any benefit at all or suffer a net detriment from a trial and bankruptcy is not clear.

### 8. *The Range of Reasonableness of the Settlement Fund in the Light of the Best Possible Recovery.*

The best possible actual in-pocket recovery were the Suffolk County verdict to be upheld on appeal would, after several years of appeals and possible retrials, be in the order of billions of dollars. It should be recognized, however, that this sum would be offset by the higher interest charges paid by LILCO in the interim and the higher resulting electric rates and by the cost of probable bankruptcy. Given the various uncertainties, the best possible recovery, were the litigation to be fought in the courts to the bitter end, would probably be between several hundred million and under a billion dollars.

### 9. *The Reasonableness of the Settlement Fund in the Light of the Attendant Risks of Litigation.*

This is the principal factor. It requires weighing the amount of the settlement against the merits of the plaintiff's case. Given the court's conclusion that there is no substantial merit to the plaintiffs' case, it is apparent that a $400 million dollar settlement is advantageous to the class. Since most members of the class are interested in 1) keeping electric rates at a minimum and 2) closing Shoreham, these two factors need to be separately considered.

#### a. Minimizing Rate Increases

It has already been noted that the credible experts agree that prompt settlement for the amount agreed upon will probably result in lower interest rates charged to LILCO and, therefore, a smaller cost to ratepayers than would otherwise be the case. Under PSC practice any increased cost of borrowing by LILCO while the litigation winds its way through the appellate courts will ultimately be paid by the ratepayers themselves. It is estimated that, because of rising interest rates, failure to resolve the Shoreham controversey last year has already added an additional $30 million a year—some 1.5 percent—to LILCO customers' annual electric bills. Newsday, Feb. 21, 1989, at 7, col. 3. Keeping Shoreham open and other indirect costs of the litigation have been estimated at as high as one million dollars a day. *Id.* at 25, col. 1. That there is a substantial financial drain on LILCO and its ratepayers in continuing the litigation while the fate of Shoreham remains unresolved is clear.

Settlement of the RICO case constitutes an essential first step before New York's government in Albany can, as a practical matter, enact the tax and other rate relief measures and arrange for the added power sources needed to minimize future rate increases and provide reliable power. Thus, without a prompt settlement, it is unlikely that other governmental agencies can take appropriate actions to protect Long Island ratepayers.

Testimony at the fairness hearings indicated that rates might actually be lower were Shoreham to close rather than open. While this is not a factor affecting the fairness of the settlement, it does suggest that closing Shoreham might not have an adverse effect on rates.

#### b. Closing Shoreham

Counsel for the representative plaintiffs and the plaintiffs themselves assert that they agreed to the settlement on the understanding that Shoreham be closed. This issue is central to the controversy. Undoubtedly the desire to prevent LILCO from opening Shoreham was a chief motive for Suffolk's development of its RICO theory in this litigation.

Various opinion polls as well as these fairness hearings and prior aspects of the litigation have demonstrated that the overwhelming majority of people in Nassau and Suffolk insist that Shoreham never open. *See* Newsday, July 3, 1988, at 30 (Gallup poll conducted June 21–26, 1988, indicated that 71% of Long Island residents oppose

opening of Shoreham); K. Grossman, Power Crazy, at xi and fn. 14 (1986) (poll commissioned by Newsday in late 1985 showed that 77% of Suffolk County residents opposed opening of Shoreham). Residents have demonstrated that their fear of a possible atomic disaster at Shoreham, putting in jeopardy the lives of their families, is now so strong and settled that no arguments about cost or safety will dissuade them. In a democracy such as ours, when the people speak so decisively, government carries out the popular will—absent some challenge by the populace to fundamental constitutional rights such as free speech for minorities.

In a few years when power and fuel are short and pollution by fossil fuels an even greater problem than it is today, many will rue the day that Shoreham was torn down. But today's decisions must be made on the basis of current fears and calculations, not hindsight.

Shoreham is dead. Those who refuse to acknowledge the obvious only make it more difficult to bury the controversy and get on with life.

This nuclear plant, in all its technical glory, will be torn down because the people will it. To paraphase Shakespeare's words, mouthed by Hamlet: "Imperious Shoreham, dead and turned to clay, Might stop a hole to keep the wind away." An equally mordant, but perhaps more apocalyptic vision applicable to Shoreham, is that of Shelley in the well known Ozymandias:

I met a traveler from an antique land
Who said: "Two vast and trunkless legs of stone
Stand in the desert. Near them, on the sand,
Half sunk, a shattered visage lies...."
....
"My name is Ozymandias, king of kings:
Look on my works, ye Mighty, and despair!"
Nothing beside remains. Round the decay
Of that colossal wreck, boundless and bare,
The lone and level sands stretch far away.

As the trial and hearings demonstrated, Shoreham was built at the urging of many who now insist on its destruction. When the idea for Shoreham was conceived in the late 1960's and early 1970's, there was widespread support in Albany and Long Island for an atomic energy plant on Long Island. Among the strongest supporters were the officials of Suffolk County. Reliance by Long Island on imported oil for its electric generators made Long Island particularly vulnerable to escalating costs as Mideast oil jumped in price. Nuclear energy was deemed a panacea. The PSC, the NRC and other agencies, and elected officials in Albany and Long Island all encouraged LILCO to build Shoreham. LILCO borrowed billions of dollars to satisfy that request.

Technical problems steadily increased the cost of the plant and delayed completion. With time, the risks attendant on nuclear incidents and the ultimate costs and risks of disposal of the plant and its spent fuel soured many former proponents. The Three Mile Island nuclear incident led to much stricter NRC standards, requiring the redesigning and rebuilding of portions of the plant at ever-increasing costs. Chernobyl and the scandal of unsafe conditions at plants manufacturing nuclear bomb components added to a growing revulsion against nuclear power on Long Island. The geographical configuration of the island presented much more difficult problems of evacuation in case of a nuclear accident than exist in inland areas where evacuation can take place in four directions rather than in one—to the west.

By the early 1980's Suffolk County had decided to oppose Shoreham. Together with allies in Albany and the support of growing numbers of people living on Long Island, it has effectively blocked Shoreham's opening. Despite the fact that the plant has been ready for operation for some years and that it is reputedly one of the safest nuclear plants in the world, it has never produced power in commercial amounts.

In short, while Shoreham was built largely with the support of government at every level and with at least the acquiescence of the majority of Long Island residents, those who encouraged the building have changed their minds. Obviously, LILCO shareholders must, in our capitalist society, bear much of the risk and cost of this change in attitude that makes Shoreham unusable. Some of that price has been paid in sharp drops in the price of LILCO's securities and missed dividend payments. Much of the cost has already been paid by the average stockholders—many of whom were people of modest means saving for retirement—in loss of value and dividends. It is an anomoly that speculators who bought up the stock at low prices will probably make maximum gains when necessary financial health is restored to LILCO. This kind of unfairness started with our nation's birth when speculators bought up soldiers' paper pay and then made fortunes after Hamilton put federal finances on a stable basis and redeemed the Confederation's pledges. R. Severo & L. Milford, The Wages of War 36–38, 53–55 (1989). It does not make the settlement less desireable to ratepayers.

Putting LILCO's finances on a stable footing is, the PSC has emphazied, essential to permit refinancing of LILCO's debt at reasonable interest rates that ultimately will be embodied in electric rates. Rate-making is not for the court, nor for Suffolk County. It is entrusted to the PSC which must assume responsibility for arranging an appropriate balance of costs to be paid by LILCO, the state government, local government and ratepayers.

In the negotiations attempting to settle the Shoreham dispute in its broad implications, elected officials have been reluctant to accept responsibility for accomplishing the closing of Shoreham with concomittant future higher electric rates. The Governor of the State of New York, almost alone among elected officials, has forthrightly addressed the problem and taken responsibility, with the assistance of other government agencies, for developing an integrated plan for closing Shoreham. See Exhibit 2; Public Service Commission, Cases 29484 and 88–E–084, Staff's Initial Brief Supporting the Settlement, August 9, 1988.

The Governor first sought the political support of the legislatures in Albany and in Suffolk before committing the state to the "global" settlement that was required to ensure closing Shoreham. It was not forthcoming. While insisting on the closing of Shoreham, the Suffolk County legislature has not been willing to accept responsibility for resulting higher electric rates. Somewhat the same view has prevailed among the legislative leaders in Albany. The result has been a stalemate and increasing future costs to ratepayers.

This gridlock has now been resolved by a number of developments making it clear that Shoreham will not open. They are:

1) The RICO case has settled and by this memorandum and order it is approved as fair. The RICO case is for all practical purposes, as dead as Shoreham. The assumption of the court and the class is that Shoreham will never open.

2) On February 28, the day before the fairness hearings were to begin, the Governor and LILCO entered into an agreement to close Shoreham. See Exhibit 2. Subsequently, legislative leaders in Albany reportedly indicated general satisfaction with this agreement. While the agreement is subject to the approval of LILCO's Board of Directors and shareholders, the PSC and other state agencies, these approvals are so highly likely, given present political and economic pressures, that Shoreham's closing can be considered a fait accompli.

3) The PSC has accepted responsibility for declaring Shoreham closed. It clearly signaled this decision when it conditioned a temporary increase in rates on the requirement that Shoreham not be operated. See Public Service Commission, Order Authorizing Temporary Rates, Cases 29484 and 88–E–084, Issued and Effective Feb. 16, 1989. In view of the Governor's position, it can confidently be expected that any future rate increases will be similarly conditioned on the permanent closing of Shoreham.

4) LILCO, by accepting the rates described in 3), has effectively accepted the Governor's condition of keeping Shoreham closed. It cannot, as a practical matter, open Shoreham during the period the temporary rates described in 3) are in effect. It is understood that LILCO will continue to apply for a license and may even bring court proceedings to cancel the condition described in 3). Such efforts are for the record and to preserve a negotiating position. Since LILCO is not viable economically without PSC rate increases, it must comply with the PSC's condition that Shoreham not be operated. Failure to comply will mean revocation of the rate increases and LILCO's bankruptcy.

5) Arrangements have been approved by the New York Power Authority to build an electric cable under Long Island Sound to tie LILCO's distribution system into the state's power grid, which extends upstate and into Canada, to take advantage of cheaper and cleaner hydroelectric power. This development, the building of local peaking power plants and severe conservation measures may moderate rising rates and ensure adequate peak power resources in the future. Dangers continue to exist, however, since citizens in many areas appear unwilling to accept the building in their own "backyards" of the local peaking power plants needed to replace Shoreham.

The RICO settlement itself is subject to LILCO Board of Directors and shareholders approval. As in the case of the agreement with the Governor, disapproval is not a viable alternative for LILCO. It cannot be conceived that LILCO's officers and directors have any intention of repudiating these agreements. Were they to do so an argument of intent to deceive the court could lead to a setting aside of the judgment settling the RICO case and dire economic consequences to LILCO in the market place.

### C. ADDITIONAL FACTORS AND CLASS MEMBERS OBJECTIONS

The court considered a variety of other objections and arguments made at the hearings, as follows:

### 1. *The Sum to be Received is Not Certain.*

It is contended that the sum that the ratepayers may receive is not certain because the court has the power to defer payments under some circumstances. This power is strictly prescribed. The court can exercise it only after a strong showing. In considering whether the showing has been made the court will take into account the needs of the ratepayers as well as of LILCO. There is nothing in the agreement which would permit elimination of the absolute obligation of LILCO to pay a total of $390 million plus up to $10 million of legal fees and related expenses to the class.

A court may retain jurisdiction to assure that parties to consent decrees comply with such decrees even in connection with state proceedings. *See, e.g., United States v. City of Yonkers,* 856 F.2d 444 (2d Cir.1988), *cert. granted,* —— U.S. ——, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989) (district court could require city council members who were parties to a consent judgment to vote to implement the consent judgment, and council members and City of Yonkers could be adjudicated in contempt for failure to abide by the consent judgment and subsequent implementing orders of the district court); *Concerned Citizens of Bridesburg v. Philadelphia Water Dept.,* 843 F.2d 679, 682 (3d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 139, 102 L.Ed.2d 112 (1988) (upholding order finding City of Philadelphia in contempt for violating odor regulations under Pennsylvania State implementation plan pursuant to the Clean Air Act); *Kohl Industrial Park Co. v. County of Rockland,* 710 F.2d 895, 902 (2d Cir.1983) (affirming order requiring County to take certain property by eminent domain since County had agreed to settlement agreement incorporated in court order).

The sum set aside for legal fees in the settlement was computed on the assumption that Suffolk County would receive some $7 million in cash. Now that Suffolk County has opted out of the class, this sum is available for future fees and costs. Counsel for the class or such other person

as the court directs, pending further order of the court, will use this residual fund under court direction, to ensure that the agreement is complied with.

The fund will also be used to pay legal and expert fees and related costs of the Citizens Advisory Panel provided for by the settlement agreement. This Panel should be of considerable assistance over its guaranteed life of five years to both LILCO and ratepayers. Upon application to the court the life of this body can be extended until the agreement is fully complied with. Both the recommendation for extending the life of the panel and for using the legal fund to pay legal, expert and other costs of attorneys and others to protect the class were made at the fairness hearings.

### 2. Subclasses are Needed.

■■■ Motions to permit subclasses were made by a number of commercial enterprises and by the Long Island Association on behalf of its commercial members. No persuasive factual basis for subclassing was shown. The settlement funds are to be divided on a pro rata basis. Distinguishing between commercial and residential customers is not warranted since all will share on a basis proportionate to their electric bills.

"Subclassing under Fed.R.Civ.P. 23(c)(4) is appropriate only when the court believes it will materially improve the litigation." *Clark Equipment Co. v. International Union*, 803 F.2d 878, 880 (6th Cir.1986). The decision as to whether or not subclasses are necessary is committed to the discretion of the trial court. *Mendoza v. United States*, 623 F.2d 1338, 1349–50 (9th Cir. 1980), *cert. denied sub nom. Sanchez v. Tucson Unified Sch. Dist.*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981) (affirming district court's denial of motion to create subclasses where district court was not "deprived of any material viewpoints, objections, or information for want of a subclass at the settlement hearing").

Subclassing is not encouraged. *See, e.g., United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 407–08, 100 S.Ct. 1202, 1214–15, 63 L.Ed.2d 479 (1980) (burden of constructing subclasses is upon the party seeking their creation and not upon the trial court); *Fisher v. Procter & Gamble Mfg. Co.*, 613 F.2d 527, 547 (5th Cir.1980), *cert. denied*, 449 U.S. 1115, 101 S.Ct. 929, 66 L.Ed.2d 845 (1981) (presumption that "a certified class is ... sufficiently harmonious and unified in interest that one set of attorneys can and should represent it adequately"). Here adding subclasses and more attorneys will compound confusion and cost, with no utility to ratepayers.

There are slight inequities which may occur because some ratepayers are present customers and, therefore, not entitled to a share of the former customer fund, but they may not remain customers during the entire distribution period. These problems have a de minimus impact because the higher rates provided for in the global settlement, exhibit 2, increase with time. Thus, the rate relief provided by the settlement roughly increases proportionately with the rates to be paid by future ratepayers. There is no sensible way to provide subclasses which will avoid these minor problems. The court retains foot of the decree powers to make appropriate modifications.

### 3. The Court Exercised Influence on the Terms of the Final Agreement.

■■■ The agreement settling the case, dated February 14, 1989, provided that a more detailed agreement would be entered into by the parties. Were there a disagreement with respect to the details of this final agreement, the parties agreed that the court should resolve the disputes. In accordance with the agreement with the parties the court did resolve a number of disputes. They dealt with details necessary to be resolved so that fairness hearings could be conducted and a final decision reached. No objection on the ground that the court assisted in resolving disputes is a basis for rejection of the settlement.

### 4. Members of the Class are Giving Up their Rights to Appear Before the Public Service Commission.

■■■ Any person has a right to petition the PSC and to bring to its attention any

matters he or she wishes. This would include providing the PSC with a transcript of the hearings before the jury and making any contentions with respect to past or future rates.

The right to petition is protected by the First Amendment to the United States Constitution. The First Amendment "prohibits not only statutory abridgment but all governmental action including judicial action that restrains free expression." *New Orleans Steamship Ass'n v. General Longshore Workers, ILA Local Union No. 1418,* 626 F.2d 455, 462 (5th Cir.1980), *aff'd. sub nom. Jackson Bulk Terminals Inc. v. International Longshoreman's Ass'n,* 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982). "[T]he right to petition shares with other First Amendment rights a focus on the importance of maintaining a free flow of ideas." *Osborn v. Pennsylvania–Delaware Service Station Dealers Ass'n,* 499 F.Supp. 553, 556 (D.Del.1980). In the area of utility regulation it has been specifically held that "the redress of grievances clause guarantees every citizen's right to petition any department of the government, including state administrative agencies such as the PSC, for a redress of grievances." *Center for United Labor Action v. Consolidated Edison Co.,* 376 F.Supp. 699, 701 (S.D.N.Y.1974) (citation omitted).

No release executed pursuant to the settlement agreement waives the right of any member of the class to seek any action by the PSC. Only causes of action arguably existing under RICO are waived. The Public Service Commission is free to give the proceedings before this court any weight it wishes.

### 5. The Amount Set Aside for Attorneys' Fees is Too Large.

█ It has been estimated, as noted above, that Suffolk County has spent at least $35 million on the suit and related litigation to date. LILCO has likely spent at least a similar amount. The fees continue to mount. Since the average ratepayer in Suffolk County is also a taxpayer, as one person who appeared at the hearings put it, Suffolk residents are in the position of suing themselves, paying fees to lawyers for both sides.

Settlement now will result in the saving of tens of millions of dollars of additional legal fees which ultimately would be paid by ratepayers and taxpayers if the dispute continued. Avoidance of such costs is in the interest of every person on Long Island.

The fees and expenses allowed for past work constitutes less than 1% of the class recovery. This is exceptionally low. Most of the fees paid will be used to ensure future benefits of the class. The attorneys fees allowed by the court will be kept to a minimum. They are not too large.

### 6. The Parties Did Not See the Final Agreement Soon Enough.

The agreement dated February 14th contained all of the elements of the settlement plan. As was indicated in the notice to the class, copies of the February 14 agreement were available at all of the courthouses and were available to anyone who wished to receive one by mail. Extensive media publicity outlined the terms. The final agreement dated February 27th was available in large quantities; every person who attended a session of the fairness hearings could obtain one without cost.

Anyone who wished to study the agreement had ample time to do so. Lawyers for some of the intervenors who claim otherwise are contradicted by the record. Their full participation in the hearings and extensive briefs demonstrate conclusively that they had an uninhibited opportunity to make their views known.

### 7. It is Unfair for Suffolk County Taxpayers Not to Reap the Benefits of the Settlement.

█ It is true that Suffolk County has expended considerable sums and effort in blocking Shoreham's operation and in conducting the RICO litigation. Because it had obtained a verdict before the class was certified, it was given the opportunity, as a matter of equity, of opting out. *See* 710 F.Supp. 1407 (E.D.N.Y.1989). Rule 23

of the Federal Rules of Civil Procedure is essentially an equitable provision.

Suffolk County opted out of the class. It has announced that it will appeal from the order dismissing its complaint. Such an appeal will have no appreciable effect on the settlement. The total, including costs and attorneys fees, that Suffolk County could obtain if its appeals to the Court of Appeals and the Supreme Court are fully successful is some $30,000,000. This maximum recovery, if it takes place at all, will not occur for several years while the case winds its way back and forth through the courts. Such a relatively small judgment will have no effect on LILCO's operations or on its ability to pay the rest of the class.

Suffolk County has, despite the fact that it opted out of the class, applied for attorneys fees and expenses of $7,484,609.53 up to January 30, 1989. In addition it seeks a "fee multiplier." Giving full credit to this application would require payment of more than $10 million in legal fees to Suffolk County alone. Suffolk is entitled to no fees from the fund made available by the class settlement. It is prosecuting a separate action on its own behalf under the RICO statute. Pursuant to that statute, if Suffolk succeeds in its suit it will be entitled to "threefold ... damages ... and the cost of the suit, including a reasonable attorney's fee." 18 U.S.C. § 1963(c). By opting out of the class, Suffolk County has determined that this tactic is more valuable to it than would be joining in the settlement and obtaining its share of the $10 million set aside for legal fees and costs. It cannot have it both ways. Its application for all or a share of the $10 million fund must be rejected. Cases permitting counsel for non-class representatives to share in fees have no applicability to this case, where the statute itself provides for an independent counsel fee in the pending litigation. *See, e.g., In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 226, 233, 237 (2d Cir.1987); *Donnell v. United States,* 682 F.2d 240 (D.C.Cir.1982), *cert. denied,* 459 U.S. 1204, 103 S.Ct. 1190, 75 L.Ed.2d 436 (1983); *Ratner v. Bakery and Confectionary Workers,* 354 F.2d 504 (D.C.Cir. 1965); *In re Ampicillin Antitrust Litigation,* 81 F.R.D. 395 (D.D.C.1978). It would be manifestly unfair to deprive the class of most or all of the $10 million fund for fees in order to pay fees of a party not participating in the settlement, particularly since most of this sum will now be used in monitoring and effectuating the agreement.

■ Suffolk County settled its own claim against LILCO's engineering firm, defendant Stone & Webster Engineering Corp., for $250,000. Suffolk is not a member of the class by virtue of its decision to opt out. Were it a member of the class, this $250,000 settlement fund would belong to the entire class. Since there was no violation of any fiduciary duty in making this private settlement, Suffolk may keep this entire sum.

Suffolk County has by its own decision deliberately placed itself in a position where, should its appeal be unsuccessful, it will not be reimbursed for any of its legal expenses, will incur liability for further expenses, will face possible liability in other pending litigation and will pay somewhat more for its electricity than other ratepayers. The County refused to consider a settlement proposal under which it would have received a significant recovery in return for relinquishing its RICO claims: participation as a member of the class in the $390 million settlement fund; some $7 million in legal fees; and, in effect, an exchange of releases, without cost, in the pending tax certiori suit and other litigation in which LILCO is suing it and where its potential liability is in the hundreds of millions.

This is a political decision made by proper authorities in Suffolk County. Suffolk taxpayers, however, can hardly complain to this court over disagreements with the decisions of their elected representatives.

8. *The Public Should not be Required to Subsidize LILCO's Management and Shoreham Costs.*

■ The question of what portions of LILCO's assets and costs should be placed in the rate base or otherwise charged to consumers is a matter within the competence of the PSC rather than this court. For the same reason that the RICO statute

does not apply, this is an issue that should be presented to the PSC for its consideration.

### 9. *The Future Of Shoreham is Unclear.*

It is apparent that further disputes about who should take responsibility for the closing of Shoreham are not productive. They will simply put off the day of an inevitable closing of Shoreham and lead to electric rates even higher than they would otherwise be. Further delay in closing this nuclear facility will cost the ratepayers and citizens of Long Island millions of extra dollars, while putting at risk the future of adequate energy sources.

No elected official—except for the Governor who has accepted his leadership role—need assume the responsibility for either the closing of Shoreham or the costs associated with such closing. The people themselves have spoken and have insisted that the facility be closed.

As for Suffolk County, it has successfully brought to the public's attention the fact that Shoreham cannot open. In a very real sense, Suffolk County may have lost the battle of this RICO litigation but it has won the war it started—the closing of Shoreham.

Under the Governor's plan the PSC will take responsibility for closing Shoreham. It will accept the onus of providing the higher electric rates which must follow under established law. Other agencies of state government will assist in providing alternate power sources to Long Island. The state legislature will undoubtedly consider sympathetically various tax and other techniques designed to reduce the impact of rate increases on Long Island. Further supplies of power from upstate, from new generators, from conservation and other techniques may reduce somewhat the effect of closing Shoreham on supply of peak demands for electricity.

LILCO and its shareholders have paid and will pay part of the price of this settlement and of the decision—by hindsight misguided—to build Shoreham.

### 10. *A Citizens Advisory Panel Should be Established.*

A number of the original named representative plaintiffs had urged Ms. Vladeck to negotiate for a Citizens Utility Board to assist ratepayers in their relations with LILCO. Such a board, called the Citizens Advisory Panel, will now be set up as a result of the agreement. Moreover, between the obligation of LILCO to provide resources and some $8 million of funds for legal and expert fees available through counsel representing the class, this panel will have substantial strength. It can assist LILCO in providing electricity more effectively to those who cannot afford higher rates.

### 11. *Conservation is Required.*

A number of persons at the fairness hearing emphasized the need for conservation instead of building new power plants. Conservation of energy on Long Island could replace, they assert, Shoreham and other power sources. The question of how far conservation measures might avoid the need for additional power sources and the relative benefits and detriment of more aggresive conservation methods is not a matter within the competence of the court. Such matters are within the realm of expertise of government agencies, the Citizens Advisory Panel, LILCO and others. Possible conservation measures are not inconsistent with, nor do they affect, the reasonableness of the settlement.

### D. UNITED STATES

The United States is not a member of the class, and has not signed the stipulation of settlement executed by representatives of the class and the LILCO defendants. Nevertheless, the United States should not be treated less favorably than other ratepayers. Accordingly, the United States will be deemed a member of the class only for purposes of payments to be made under the settlement agreement.

### E. STONE & WEBSTER ENGINEERING CORPORATION

The settlement agreement also provides for settlement of the claims asserted

against Stone & Webster Engineering Corp. for the sum of $50,000. The analysis supporting approval of the LILCO settlement applies with greater force to this settlement and no class member or intervenor has objected to it. Accordingly, the court finds it to be fair and reasonable.

## F. SUMMARY OF REASONS FOR APPROVAL

The majority of those who testified opposed the settlement for one or more of the reasons indicated. Some supported it. A number of people supported the operation of Shoreham. Most opposed Shoreham's opening. The vast bulk of people who will be affected expressed no opinion. It can be assumed that they, like their representative, Judith Vladeck, Esq., believe that a substantial reason for approving the settlement was to end the continuing controversy over Shoreham and RICO. Terminating this controversy will permit LILCO and state and local officials, as well as users of electricity, to plan effectively for the future. Providing reliable electric power in sufficient quantity and at the least possible cost will present great difficulties on Long Island. Solving these problems is not enhanced by continuing the legal and emotional controversies surrounding this RICO litigation.

Perhaps the most touching and poignant expression of this view was provided by an individual who sought, along with a number of others, to represent the class from the outset of the litigation. He, like they— primarily residents of the East End of Suffolk County most affected by Shoreham— were, and are, strong opponents of nuclear power. A number of them have devoted many years to the campaign to close Shoreham. He testified that he had been living in an automobile adjacent to the Shoreham Nuclear Power Station since January 31st as a part of a "spiritual" quest. He disagreed with those of his "fellow class representatives" who opposed the settlement. He approved the Governor's action in entering into an agreement with LILCO for the closing of Shoreham, stating:

> The Governor's action is of the heart, protecting the health and safety of Long Island families, and putting this ahead of political consequences.

> I would define his action on behalf of the common good of Long Islanders as an act of statesmanship, a most rare commodity today.... Is the LILCO settlement fair? Standing by itself, without the end of Shoreham, I would say it is not fair. However, I am commenting on a settlement of four hundred million dollars and I am constantly aware that this settlement is being made in a political context, a political environment.

> And what does a closed decommissioned Shoreham mean to ratepayers in terms of the economics of health benefits? How do you measure the economic benefit of protecting every woman's womb and fetus from radiation poisoning? For me, this protection is economically priceless.

> Additionally, what is the financial benefit for not poisoning our mother the earth with radiation waste which will be a source of pollution for thousands of years to come? For me, protecting the health of mother earth, the sole source of all life, is also priceless.

> And so I have searched to find a balance between the economics of the RICO suit vis-a-vis the purely economic savings and the health related savings of keeping Shoreham closed.

> I have concluded that I would rather trade off some RICO money in order to protect the ratepayer financial interests in abandoning Shoreham.

> In the end, I believe that this will serve the goal of justice in some convoluted way in that those whose God is money will get money and those whose God is ... the protection of human life and our mother the earth shall have fulfillment. Therefore, as long as the Shoreham nuclear monster dies as part of this process I am privileged to support this settlement.

## IV. CONCLUSION

The court has concluded that the settlement is fair and reasonable. It is approved.

The court retains continuing jurisdiction to administer, effectuate and enforce the settlement agreement and to protect the parties.

So ordered.

## EXHIBIT 1

County of Suffolk, a municipal corporation, Custom Extruders, Inc.

—and—

Robert Alcorn, Christopher S. George, Fred Harrison, Peter Maniscalco, William P. Quinn, Robert Hoffman, Susan Chase, Yolanda Owens, James Roth, Myra Berzoff, and Sandra Rosenberg, on behalf of themselves and all others similarly situated, Plaintiffs,

—against—

Long Island Lighting Company, Stone & Webster Engineering Company, Charles R. Pierce, Wilfred O. Uhl, Charles J. Davis and Andrew W. Wofford, Defendants.

United States of America ex rel. W. Gordon Dick and John P. Daly, Jr., Plaintiffs,

—against—

Long Island Lighting Company, Charles R. Pierce, Wilfred O. Uhl, Charles J. Davis and Andrew W. Wofford, Defendants.

United States District Court Eastern District of New York

87–CV–0646 (JBW), 88–CV–2065 (JBW) STIPULATION OF PARTIAL SETTLEMENT OF RICO CLASS ACTION AND FALSE CLAIMS ACTION

WHEREAS:

A. The above action captioned *County of Suffolk, et al. v. Long Island Lighting Company, et al.*, 87–CIV–646 (JBW) is pending in the District Court.

B. The above action captioned *United States of America ex rel. W. Gordon Dick and John P. Daly, Jr. v. Long Island Lighting Company, et al.*, 88–CIV–2065 (JBW) is pending in the District Court.

C. *Position of Class Counsel*—Class Counsel, Vladeck, Waldman, Elias & Englehard, P.C., states that the Ratepayer Class, through Class Counsel, has made a thorough investigation into the facts and circumstances relevant to the allegations in the Amended RICO Complaint. In connection with that investigation, Class Counsel has inspected thousands of pages of documents and testimony, has reviewed the transcript of the trial of Suffolk County's claims, and has reviewed and participated in the post-trial motions and proceedings. In evaluating the settlement provided for herein, Class Counsel has considered: the expense and length of time necessary to prosecute the RICO Action through trial; the uncertainties of the outcome of this complex litigation in view of the District Court's dismissal of Suffolk County's claims under the RICO Act; the fact that judicial resolution of Class Plaintiffs' claims, whenever and however determined, will likely be submitted for appellate review, as a consequence of which substantial time may pass until there would be a final adjudication of the claims and defenses asserted; the fact that there would be uncertainty concerning LILCO's financial future; and the benefit provided by the proposed settlement to members of the Ratepayer Class. Class Counsel's estimate of the value of the settlement was predicated on the expectation of the closing of the Shoreham Nuclear Power Station and the financial impact of the closing. Based upon these considerations, Class Counsel has concluded that it is in the best interests of the Ratepayer Class to settle the claims of the Ratepayer Class in the RICO Action on the terms set forth herein, providing that the assumptions upon which the proposed settlement agreement was based are accurate.

D. *Position of Government's Counsel*—The Government states that the Government, through its counsel, has made a thorough investigation into the facts and circumstances relevant to the allegations in the False Claims Complaint. In connection with that investigation, the Government's Counsel has inspected thousands of pages

of documents and testimony, has reviewed the transcript of the trial of Suffolk County's claims, and has reviewed and participated in the post-trial motions and proceedings. In evaluating the settlement provided for herein, the Government's Counsel has considered: the expense and length of time necessary to prosecute the False Claims Action through trial; the uncertainties of the outcome of this complex litigation in view of the District Court's dismissal of Suffolk County's claims under the RICO Act; the fact that judicial resolution of the Government's claims, whenever and however determined, will likely be submitted for appellate review, as a consequence of which substantial time may pass until there would be a final adjudication of the claims and defenses asserted; and the substantial benefit provided by the proposed settlement to the Government. Based upon these considerations, the Government has concluded that it is in its best interests to settle the claims in the False Claims Action on the terms set forth herein. In connection with this settlement, the Government takes no position concerning whether the Shoreham Nuclear Power Station should or should not operate.

E. *Position of RICO Defendants' Counsel*—The RICO Defendants state that the RICO Defendants, while denying all wrongdoing of any kind whatsoever and denying all liability to Class Plaintiffs, the Ratepayer Class, Suffolk County, and the Government, and without conceding any infirmity in the defenses they have asserted or intended to assert in the RICO Action or the False Claims Action, as the case may be, consider it desirable that the RICO Action and the False Claims Action be dismissed on the terms set forth herein in order to avoid further expense, to dispose of burdensome and protracted litigation, to permit the continued operation of their affairs unhindered by expensive litigation and by distraction and diversion of themselves and the personnel of LILCO and Stone & Webster. The RICO Defendants expressly deny that any assumptions concerning the closing of the Shoreham Nuclear Power Station ever were a part of the negotiations leading to this settlement, assert that the issue of whether the Shoreham Nuclear Power Station should be closed was excluded from the settlement negotiations at the outset, and deny that the value of the settlement was in any way predicated upon the expectation of the closing of the Shoreham Nuclear Power Station and the financial impact of the closing.

NOW, THEREFORE, IT IS STIPULATED AND AGREED, by and among the undersigned, that the claims of the Ratepayer Class in the RICO Action, and the claims of the Government in the False Claims Action, shall be settled and compromised, subject to the approval of the District Court and pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, upon and subject to the terms and conditions set forth below.

*Definitions*

1. As used herein, the following terms shall have the following meanings, and when referred to in this Stipulation shall always have initial letters capitalized:

(a) "Amended RICO Complaint" shall mean the second amended complaint dated December 1, 1988 which the District Court granted Class Plaintiffs leave to file in its memorandum and order dated February 13, 1989.

(b) "Approved Claim" shall mean an accepted Proof of Claim.

(c) "Claimant" shall mean the United States of America or any member of the Ratepayer Class who files a Proof of Claim in such manner and within such time as provided in this Stipulation or as the District Court shall prescribe.

(d) "Class Counsel" shall mean the law firm of Vladeck, Waldman, Elias & Englehard, P.C.

(e) "Class Escrow Agent" shall mean the law firm of Vladeck, Waldman, Elias & Englehard, P.C.

(f) "Class Period" shall mean the period from and including January 1, 1974 through and including the date of this Stipulation.

(g) "Class Plaintiffs" shall mean plaintiffs Robert Alcorn, Christopher S. George,

Fred Harrison, Peter Maniscalso, William P. Quinn, Yolanda Owens, Susan Chase, Robert Hoffman, James Roth, Sandra Rosenberg, and Myra Berzoff in the RICO Action.

(h) "Class Settlement Agreement" shall mean the agreement dated February 14, 1989 and annexed as Exhibit A hereto, which provides for the proposed settlement of the claims of the Ratepayer Class against the LILCO Defendants in the RICO Action and the claims of the Government against the LILCO Defendants in the False Claims Action.

(i) "Distribution Date" shall mean the date upon which the Distribution Order shall no longer be subject to appellate review.

(j) "Distribution Order" shall mean the order of the District Court described in paragraph 22(a) of this Stipulation.

(k) "District Court" shall mean the United States District Court for the Eastern District of New York.

(l) "Effective Date" shall mean the date determined pursuant to paragraph 19 of this Stipulation.

(m) "Fairness Hearing" shall mean the hearing scheduled by the District Court on March 1 and March 3, 1989 to consider the reasonableness and fairness of the Class Settlement Agreement and the Stone & Webster Settlement Agreement.

(n) "False Claims Act Claims" shall mean the claims asserted on behalf of and for the benefit of the Government in the False Claims Complaint.

(o) "False Claims Action" shall mean the action captioned *United States of America ex rel. W. Gordon Dick and John P. Daly, Jr. v. Long Island Lighting Co., et al.,* 88–CV–2065 (JBW) pending in the District Court.

(p) "False Claims Complaint" shall mean the amended complaint dated September 1, 1988 in the False Claims Action.

(q) "Final Judgment of Dismissal of False Claims Action" shall mean the judgment to be entered in the False Claims Action pursuant to paragraph 18 of this Stipulation and substantially in the form of Exhibit G hereto.

(r) "Final Judgment of Dismissal of RICO Class Action" shall mean the judgment to be entered in the RICO Action pursuant to paragraph 17 of this Stipulation and substantially in the form of Exhibit F hereto.

(s) "Former Ratepayer Fund" shall mean the fund created by the payments specified in paragraph 6 of this Stipulation.

(t) "Former Ratepayer Proof of Claim" shall mean a proof of claim to be filed by Former Ratepayers pursuant to paragraph 20 of this Stipulation and substantially in the form annexed hereto as Exhibit C.

(u) "Former Ratepayers" shall mean all persons and entities who were ratepayers of LILCO at any time during the period from January 1, 1974 through and including December 31, 1989 and who are not ratepayers of LILCO on or after January 1, 1990, and shall mean the United States of America solely in its capacity as a payor of LILCO utility bills to or on behalf of such Former Ratepayers.

(v) "Government" shall mean the United States of America, by W. Gordon Dick and John P. Daly, Jr.

(w) "Government's Counsel" shall mean the firm of Bower & Gardner.

(x) "Hearing Notices" shall mean the notices of the Fairness Hearing that were directed to members of the Ratepayer Class pursuant to the District Court's order dated February 15, 1989, as amended by order dated February 16, 1989.

(y) "Individual Defendants" shall mean the former officers and/or directors of LILCO named as defendants in the RICO Action and the False Claims Action, namely Charles R. Pierce, Wilfred O. Uhl, Charles J. Davis and Andrew W. Wofford.

(z) "Intervenors" shall mean Nassau County, the City of New York, Grumman Corporation, The Longwood Company, N.E. Blankman & Co., Inc., Plascal Corp., Amco Plastic Materials, Inc., The Staver Company, Incorporated, Exit 60 Expressway Motel, Inc., Exit 60 Truck & Car Wash, Inc., Sayville Brushless Car Wash, Inc., Wel-

come Travel Agency, Long Island Association, Inc., Check–Mate Industries, Inc., Hymead Energy Corporation, Hymead Sales, Ltd., Knight Manufacturing Company, Inc., and Shoreham–Wading River School District.

(aa) "LILCO" shall mean Long Island Lighting Company and all of its predecessors and successors, parents, subsidiaries, and affiliates.

(bb) "LILCO Defendants" shall mean LILCO and the Individual Defendants.

(cc) "Net Settlement Fund" shall mean the Former Ratepayer Fund less expenses incurred in connection with the administration and distribution of the Former Ratepayer Fund.

(dd) "Proof of Claim" shall mean a Former Ratepayer Proof of Claim and/or a United States Proof of Claim, as the context indicates herein.

(ee) "Proportional Reimbursable Loss" shall be the percentage of the Net Settlement Fund to be paid to a Claimant who files an Approved Claim pursuant to paragraph 15 of this Stipulation. Subject to paragraph 16 of this Stipulation, the Proportional Reimbursable Loss for each Claimant who files an Approved Claim shall be determined by a fraction, the numerator of which shall be the Claimant's Recognized Loss and the denominator of which shall be the total of the Recognized Losses of all Claimants.

(ff) "PSC" shall mean the New York State Public Service Commission.

(gg) *"Qui Tam* Plaintiffs" shall mean W. Gordon Dick and John P. Daly, Jr.

(hh) "Ratepayer Claims" shall mean the claims asserted in the Amended RICO Complaint on behalf of the Ratepayer Class.

(ii) "Ratepayer Class" shall mean all persons and entities who were ratepayers of LILCO at any time during the period January 1, 1974, through the present and also those who are or will be ratepayers of LILCO, but does not include the United States of America or, if it elects to opt out of the Ratepayer Class, Suffolk County.

(jj) "Rate Reduction Plan" shall mean LILCO's rate reductions and payments to Former Ratepayers provided for by paragraphs 4 and 5 of this Stipulation.

(kk) "Recognized Loss" shall mean the amount determined as specified in paragraph 16 this Stipulation.

(ll) "RICO Act" shall mean the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.*

(mm) "RICO Action" shall mean the action captioned *County of Suffolk, et al. v. Long Island Lighting Company, et al.,* 87–CV–646 (JBW) pending in the District Court.

(nn) "RICO Defendants" shall mean the LILCO Defendants and Stone & Webster.

(oo) "RICO Defendants And Related Parties" shall mean the RICO Defendants and their respective present and former officers, directors, partners, employees, subsidiaries, parents, affiliates, predecessors and successors, and their respective spouses, heirs, executors, custodians, administrators, beneficiaries, and assigns.

(pp) "RICO Defendants' Counsel" shall mean the firms representing the RICO Defendants who execute this Stipulation.

(qq) "Settled False Claims Act Claims" shall mean any and all rights, civil claims and causes of action, of any nature whatsoever, against the RICO Defendants And Related Parties, whether known or unknown, pleaded or unpleaded, suspected or unsuspected, for compensatory damages, punitive damages, or any other relief which were or might have been brought from the beginning of time up to the date hereof by or on behalf of the United States of America or the *Qui Tam* Plaintiffs, whether brought under state or federal law, based upon or arising from the PSC proceedings complained of or raised, or that might or could have been complained of or raised, in the False Claims Action, the False Claims Complaint, or the False Claims Act Claims.

(rr) "Settled Ratepayer Claims" shall mean any and all direct, individual, or class rights, claims, and causes of action, of any nature whatsoever, against the RICO Defendants And Related Parties, whether

known or unknown, pleaded or unpleaded, suspected or unsuspected, for compensatory damages, punitive damages, or any other relief, which were or might have been brought from the beginning of time up to the date hereof by or on behalf of any member of the Ratepayer Class, whether brought under state or federal law, based upon or arising from the PSC proceedings complained of or raised, or that might or could have been complained of or raised, in the RICO Action, the Amended RICO Complaint, or the Ratepayer Claims as defined in paragraph 1(hh) of this Stipulation.

(ss) "Settlement Administrator" shall mean the person or entity designated by Class Counsel to process the Proofs of Claim and to administer and distribute the Former Ratepayer Fund.

(tt) "Stipulation" shall mean this Stipulation of Partial Settlement of RICO Class Action and False Claims Action, including the Exhibits thereto.

(uu) "Stone & Webster" shall mean Stone & Webster Engineering Corp. and all of its predecessors and successors, parents, subsidiaries, and affiliates.

(vv) "Stone & Webster Settlement Agreement" shall mean the agreement dated February 19, 1989 and annexed as Exhibit B hereto, which provides for the proposed settlement of the claims of the Ratepayer Class against Stone & Webster in the RICO Action.

(ww) "Summary Notice" shall mean the notice of the settlement of the RICO Action in the form annexed as Exhibit E hereto.

(xx) "United States Proof of Claim" shall mean a proof of claim to be filed by the United States of America pursuant to paragraph 20 of this Stipulation and substantially in the form annexed hereto as Exhibit D.

*The Settlement*

2. In full settlement of the Ratepayer Claims and the False Claims Act Claims as against the LILCO Defendants:

(a) LILCO shall pay to the Ratepayer Class and to the United States of America, as hereinafter set forth in paragraphs 4, 5 and 6, the sum of Three Hundred Ninety Million Dollars ($390,000,000) in the form of (i) rate reductions, and (ii) payments to Former Ratepayers;

(b) The LILCO Defendants shall pay, as hereinafter set forth in paragraph 7 and upon approval of the District Court, reasonable attorneys' fees and litigation expenses in an amount not to exceed Ten Million Dollars ($10,000,000); and

(c) LILCO shall recognize a Citizen Advisory Panel, as hereinafter set forth in paragraph 10.

3. In full settlement of the Ratepayer Claims as against Stone & Webster, Stone & Webster shall pay the Ratepayer Class, as hereafter set forth in paragraph 9, Fifty Thousand Dollars ($50,000).

*The Rate Reduction Plan*

4. Subject to the provisions of paragraphs 5 and 6 of this Stipulation, LILCO shall pay rate reductions provided for in this Stipulation as follows:

(a) LILCO shall pay the Ratepayer Class a total of $390 million in the form of rate reductions over a period of 10 years (the "Rate Reduction Plan").

(b) The United States of America shall receive its proportionate share of the Rate Reduction Plan as a LILCO ratepayer, computed in the same manner as for the Ratepayer Class.

(c) The first rate reduction shall begin in June, 1990.

(d) The annual rate reductions required by this Stipulation shall be accomplished in accordance with the following schedule, commencing on the month and year indicated:

| | |
|---|---|
| June 1990 | $ 20 Million |
| June 1991 | $ 20 Million |
| June 1992 | $ 20 Million |
| June 1993 | $ 30 Million |
| June 1994 | $ 30 Million |
| June 1995 | $ 40 Million |
| June 1996 | $ 50 Million |
| June 1997 | $ 60 Million |
| June 1998 | $ 60 Million |
| June 1999 | $ 60 Million |

(e) The Rate Reduction Plan shall reduce rates to LILCO's ratepayers in proportion to the electric rate payments that would

otherwise have been made by each ratepayer. The Rate Reduction Plan shall be an adjustment to individual twelve monthly electric bills. LILCO shall not seek any rate revenue which recovers any portion of the Rate Reduction Plan. LILCO will not attempt to obtain the sums listed above from its ratepayers.

(f) It is contemplated that each monthly bill will be reduced by a percentage calculated as the ratio of (i) the total dollar amount of the reduction to ratepayers for that year, divided by (ii) LILCO's anticipated revenue for that year as established in LILCO's rates filed before the PSC. Any deficiency or overage between the total reductions applied to ratepayers in each year and the revenue reductions required for that year in the Rate Reduction Plan shall be applied to the revenue reductions for the following year of the Rate Reduction Plan with an interest factor equal to LILCO's total weighted rate of return on rate base. Technical difficulties in arriving at this result shall be resolved by modifications in procedures approved by the District Court.

(g) To assure compliance with this paragraph, LILCO shall file appropriate tariffs with the PSC showing the method of adjusting individual bills as described above. LILCO also shall certify to the PSC in each rate application filed within the settlement period, and to the District Court and to Class Counsel and the Government's Counsel in each a monitoring report filed hereunder, that LILCO has not sought nor been provided with any rate revenue which recovers any portion of the rate reductions called for by this paragraph and that the rates LILCO seeks do not attempt to obtain the sums of the reductions from LILCO ratepayers. In the annual monitoring report LILCO shall supply supporting financial data to the District Court and to Class Counsel and the Government's Counsel.

(h) The above revenue reductions are the total amount that LILCO shall guarantee payment for all purposes covered by this Stipulation, including (i) payments to the United States of America, any Intervenors and other members of the Ratepayer Class,

and (ii) any other expenses of this settlement except attorneys' fees, expenses and costs as further described in paragraph 7 below.

*Former Ratepayer Fund*

5. (a) LILCO will establish the Former Ratepayer Fund for the purpose of satisfying claims of Former Ratepayers and for claims of the United States of America for reimbursement of electric utility payments that the United States of America paid directly to LILCO on behalf of Former Ratepayers or indirectly to LILCO through Former Ratepayers. Subject to the provisions of paragraph 5(b) and 6 and of this Stipulation, LILCO will establish the Former Ratepayer Fund by subtracting $10 million from the annual rate reduction scheduled to become effective as of June, 1990 and by paying $10 million to the Class Escrow Agent on June 1, 1990. The Class Escrow Agent will promptly deposit the $10 million in an interest-bearing account and shall distribute or cause to be distributed the Former Ratepayer Fund, less expenses incurred in connection with the administration and distribution of the Former Ratepayer Fund, to Former Ratepayers and to the United States of America as prescribed in paragraph 15 of this Stipulation.

(b) Instead of paying the entire $10 million on June 1, 1990, LILCO may elect to pay the $10 million in twelve equal monthly installments, with the first installment to be paid on June 1, 1990. If LILCO so elects, each of the eleven installments following the first installment shall include a payment representing interest at the same rate the escrow account is then earning. In the event that the Settlement Administrator certifies that distribution of the Former Ratepayer Fund is ready to be made prior to June 1, 1991, LILCO shall, on twenty (20) days notice from the Settlement Administrator, pay the remaining balance due to the Former Ratepayer Fund.

*Amendment or Modification of Rate Reduction Plan*

6. Class Counsel and LILCO agree that it is in the best interests of LILCO ratepayers for LILCO to return to financial health

at the least cost to ratepayers. The District Court will retain continuing jurisdiction over this settlement throughout the implementation of this Stipulation and Rate Reduction Plan to further the purposes to be served by this settlement.

(a) Upon a showing of good cause, the District Court shall enter orders in aid of its jurisdiction to further the purposes to be served by this settlement.

(b) Any petition for amendment or modification of the Rate Reduction Plan shall be on notice to counsel for all parties and to the PSC. The PSC will have the right to be heard before the District Court orders any modification of the Rate Reduction Plan.

(c) For the purposes of this paragraph 6, the parties recognize the possibility that under certain circumstances payments of the revenue reductions might contribute to financially constraining LILCO in such a way as to lead to increases in certain costs that would be passed through to ratepayers, such as borrowing costs. Class Counsel agrees to review analyses that LILCO may develop in connection with any proposal by LILCO for modification of the Rate Reduction Plan. The analyses shall be presented in a form that can be evaluated by experts for the Ratepayer Class, and LILCO shall provide such financial and technical information as is necessary for evaluation of the proposal. Normally the parties will be expected by the District Court to consult with each other before applying to the District Court for relief. Experts for the Ratepayer Class shall complete their analysis of such information promptly.

If Class Counsel does not agree with LILCO's proposal for modification of the Rate Reduction Plan, then the matter will be submitted to the District Court. The District Court shall not enter any order which reduces or has the effect of reducing the total $390 million dollar amount of rate reductions agreed to. The District Court, after hearing from the parties and interested persons, may defer to the following year, but not grant forfeiture or elimination of, all or any portion of the agreed upon reduction.

Since the parties have agreed that LILCO should return to financial health at the least cost to ratepayers, Class Counsel shall have the right to petition the District Court for modification of the Rate Reduction Plan to accelerate rate reductions upon improvement in LILCO's financial health. Normally the parties will be expected by the District Court to consult with each other before applying to the District Court for relief. No acceleration shall be permitted which reduces LILCO's financial bond ratings below investment grade.

In connection with any requests for modification as set forth herein, LILCO shall report to the District Court and to Class Counsel and the Government's Counsel any relevant financial considerations which may affect LILCO's ability to make the reductions intended in the Rate Reduction Plan, and shall provide copies of documents relevant to the foregoing.

Class Counsel may apply to the District Court on a quarterly basis for fees and litigation expenses incurred in connection with services provided in the enforcement, monitoring, and implementation of the terms of this settlement during its duration, including fees and costs for services under this paragraph and fees for experts. LILCO may oppose such application on grounds of reasonableness, subject to final approval by the District Court. Payments by LILCO for these approved fees and litigation expenses shall be payable from and shall not exceed the $10 million provided for under paragraph 7 of this Stipulation and shall not reduce the amount allocated for the rate reductions.

(d) Class Counsel, LILCO, and the District Court shall give due consideration to ensuring that this settlement does not prevent LILCO from achieving and maintaining financial health.

*Litigation Expenses*

7. Reasonable attorneys' fees and litigation expenses to Class Counsel and the Government's Counsel, and all costs of notice, publication and administration of the settlement shall be allocated by the District Court. The total amount of attorneys'

fees, costs and expenses paid by the LILCO Defendants to Class Counsel, Suffolk County, and the Government's Counsel, and other costs and expenses including any award to the *Qui Tam* Plaintiffs under paragraph 8 of this Stipulation and the costs of the Hearing Notices and any other administrative costs advanced by LILCO, shall not exceed $10 million. Payments of the foregoing litigation expenses shall be in addition to the rate reductions described in paragraph 4 of this Stipulation and shall be paid pursuant to further order of the District Court. The LILCO Defendants shall have the right to oppose any application for fees, expenses and costs on the ground of reasonableness, subject to final approval by the District Court.

8. The *Qui Tam* Plaintiffs in the False Claims Action shall receive an amount fixed by the District Court, taking into account the claims asserted under the False Claims Act, payable pursuant to paragraph 7 of this Stipulation. The *Qui Tam* Plaintiffs shall have the right to present their position to the District Court.

9. Upon approval of this Stipulation and Settlement by the District Court, Stone & Webster shall pay or cause to be paid Fifty Thousand Dollars ($50,000) to Class Counsel, who promptly shall use this amount to reimburse LILCO for the costs of the Hearing Notices provided to the Ratepayer Class.

*Citizens Advisory Panel*

10. LILCO will recognize a Citizens Advisory Panel and will provide meeting space and access to LILCO's relevant publicly available technical and financial information. The Citizens Advisory Panel shall be comprised of representatives from consumer organizations, organizations representing economically disadvantaged Long Islanders, and the Long Island business community to study and advise LILCO and the public concerning ways to improve electric service, to mitigate rate increases, to control energy costs, and to assist ratepayers to conserve energy. At least one member of the Citizen Advisory Panel shall be a Class Plaintiff or an Intervenor, subject to approval of the District Court. The period of the Citizen Advisory Panel's existence shall be five years, subject to extension by party agreement.

(a) Class Counsel and LILCO shall each nominate six persons to the Citizens Advisory Panel. Class Counsel and LILCO each shall name two nominees as representatives of (i) consumer organizations, (ii) organizations representing economically disadvantaged Long Islanders, and (iii) the Long Island business community. One of Class Counsel's nominees shall be a Class Plaintiff or Intervenor. All nominees of Class Counsel and LILCO shall be subject to approval of the District Court.

(b) The twelve nominees approved by the District Court shall nominate a thirteenth member of the Citizens Advisory Panel, who shall be a member subject to the approval of the District Court.

(c) Once constituted, the Citizens Advisory Panel shall meet to adopt by-laws and to conduct such further activities as the Citizen Advisory Panel deems appropriate.

*United States of America*

11. In consideration of the provisions of this Stipulation, the United States of America will not seek penalties from the RICO Defendants And Related Parties under the False Claims Act arising from or related to the claims in the False Claims Action.

*Approval And Consent Required*

12. This Stipulation is subject to and conditioned upon:

(a) Approval of a majority of LILCO shareholders pursuant to vote to be taken at the 1989 Annual Shareholders Meeting;

(b) Consent, with respect to the provisions relating to the United States of America, by the United States Attorney for the Eastern District of New York, where such consent is required by law.

*Allocation of The Former Ratepayer Fund*

13. The Former Ratepayer Fund, less all fees and expenses that are paid in connection with the administration and distribution of payments to Former Ratepayers, shall constitute the Net Settlement Fund, which shall be distributed to Former Rate-

payers in the manner and subject to the conditions set forth herein, subject to the provisions of paragraph 16(b) of this Stipulation.

14. Promptly after the Effective Date, as defined in paragraph 19 of this Stipulation, but not before January 1, 1990, Class Counsel shall cause the Summary Notice of the settlement of the RICO Action substantially in the form annexed as Exhibit E hereto to be published as directed by the District Court, and shall cause a Former Ratepayer Proof of Claim substantially in the form annexed as Exhibit C hereto to be mailed to all Former Ratepayers who respond to the Summary Notice.

15. Subject to the provisions of paragraph 16(b) of this Stipulation, the Net Settlement Fund shall be distributed to Claimants who filed an Approved Claim. Payments to Claimants shall be proportional based upon each Claimant's Recognized Losses (as determined in paragraph 16(a) of this Stipulation) as compared to the total Recognized Losses of all Claimants (the "Proportional Reimbursable Loss").

16. (a) A Claimant's "Recognized Loss" shall be, for each year between January 1, 1974 and December 31, 1989 in which the Claimant received electric utility service from LILCO, the greater of (i) $20.00, or (ii) 2% of the amount paid by the Claimant to LILCO for electric utility service, as shown by proof of such payments satisfactory to the Settlement Administrator.

(b) In the event that the total amount of the Recognized Losses of all Claimants who file Approved Claims is less than the Net Settlement Fund on the Distribution Date, each such Claimant shall receive no more than his or her Recognized Loss. The amount of the Net Settlement Fund less the total of all Recognized Losses of Claimants (the "Spillover Amount") shall be returned to LILCO on the Distribution Date, and LILCO shall increase the annual rate reduction for the following year by the Spillover Amount in its next rate application to the PSC in accordance with the procedures described in paragraph 4 of this Stipulation.

*Judgment To Be Entered In The RICO Action*

17. If the District Court approves the settlement embodied in the Stipulation, the Final Judgment of Dismissal of RICO Class Action shall be entered in the RICO Action substantially in the form of Exhibit F attached hereto, containing the following terms:

(a) Decreeing that this Stipulation, the judgment, and the fact of settlement are not an admission by any RICO Defendant of any liability or wrongdoing whatsoever, nor is the judgment a finding of the validity or invalidity of any claims in the RICO Action or of any wrongdoing by any of the RICO Defendants; that neither the Stipulation, the judgment, nor the fact of settlement shall be used or construed as an admission or finding of any fault, liability or wrongdoing by any person; that neither the Stipulation, the fact of settlement nor the settlement proceedings, the settlement negotiations, the judgment, nor any related document shall be offered or relied upon as an admission, concession, or inference against any party in any proceeding other than such proceedings as may be necessary to consummate or enforce this Stipulation and the settlement;

(b) Approving the settlement of the RICO Action in accordance with Rules 23 and 54 of the Federal Rules of Civil Procedure, adjudging it to be fair, reasonable and adequate, and directing execution and implementation of all its terms and provisions;

(c) Dismissing the Amended RICO Complaint and the Ratepayer Claims as against the RICO Defendants, with prejudice, and without costs as to all members of the Ratepayer Class, except for attorneys' fees and litigation expenses as provided under paragraph 27 of this Stipulation;

(d) Adjudging that all members of the Ratepayer Class shall conclusively be deemed to have released and discharged the RICO Defendants And Related Parties from any Settled Ratepayer Claims, and permanently barring and enjoining the members of the Ratepayer Class from asserting against the RICO Defendants And

Related Parties, any claim, demand, right, liability or cause of action arising out of the Settled Ratepayer Claims which any member of the Ratepayer Class had, has, or may have in the future, as defined in paragraph 1(rr) of this Stipulation, except an award under paragraph 8 of this Stipulation.

(e) Providing that a separate order shall be entered approving an award of attorneys' fees and expenses as the District Court may allow and that such order shall not disturb or affect any of the terms of the Final Judgment of Dismissal of RICO Class Action;

(f) Providing that the Hearing Notices given to members of the Ratepayer Class fully and accurately informed the members of the Ratepayer Class of all material elements of this litigation and the proposed settlement, and constituted valid, due and sufficient notice to all members of the Ratepayer Class, complying fully with Rule 23 of the Federal Rules of Civil Procedure and the United States Constitution; and

(g) Reserving jurisdiction over consummation and performance of the settlement, including the award of attorneys' fees and expenses pursuant to paragraph 27 of this Stipulation.

*Judgment To Be Entered In The False Claims Action*

18. If the District Court approves the settlement of the False Claims Action embodied in this Stipulation, the Final Judgment of Dismissal of False Claims Action shall be entered in the False Claims Action substantially in the form of Exhibit G and containing the following terms:

(a) Decreeing that this Stipulation, the judgment, and the fact of settlement are not an admission by any RICO Defendant of any liability or wrongdoing whatsoever, nor is the judgment a finding of the validity or invalidity of any claims in the False Claims Action or of any wrongdoing by any of the RICO Defendants; that neither the Stipulation, the judgment, nor the fact of settlement shall be used or construed as an admission or finding of any fault, liability or wrongdoing by any person; that neither the Stipulation, the judgment, the fact of settlement nor the settlement proceedings, the settlement negotiations, nor any related document shall be offered or received in evidence as an admission, concession, or inference against any party in any proceeding other than such proceedings as may be necessary to consummate or enforce this Stipulation and the settlement;

(b) Approving the Stipulation and settlement as fair, reasonable, and adequate to the United States of America, directing execution and implementation of all its terms and provisions, and dismissing the False Claims Action and all causes of action and claims therein with prejudice;

(c) Dismissing the False Claims Complaint and the False Claims Act Claims as against the LILCO Defendants with prejudice and without costs;

(d) Adjudging that the *Qui Tam* Plaintiffs, on their own behalf and on behalf of the United States of America, shall conclusively be deemed to have released and discharged the RICO Defendants And Related Parties from any Settled False Claims Act Claims, and permanently enjoining and barring the United States of America and the *Qui Tam* Plaintiffs, on their own behalf and on behalf of the United States of America, from asserting against the RICO Defendants And Related Parties any claim, demand, right, liability or cause of action arising from the Settled False Claims Act Claims which the United States of America or the *Qui Tam* Plaintiffs had, has or may have in the future, as defined in paragraph 1(qq) of this Stipulation, except an award under paragraph 8 of this Stipulation.

(e) Adjudging that the LILCO Defendants shall conclusively be deemed to have released and discharged the *Qui Tam* Plaintiffs, individually and not as employees of Stone & Webster, from only those claims, demands, rights, liabilities, or causes of action, whether known or unknown, pleaded or unpleaded, suspected or unsuspected, for compensatory damages, punitive damages or other relief, based upon or arising from their activities as *Qui Tam* Plaintiffs in the False Claims Action.

(f) Providing that a separate order shall be entered approving an award of attorneys' fees and expenses for Government's Counsel as the District Court may allow, and determining the amount of an award, if any, to the *Qui Tam* Plaintiffs, provided that the total amount of attorneys' fees and expenses awarded pursuant to paragraph 27 of this Stipulation shall not exceed $10 million, and that such order may not disturb or affect any of the terms of the Final Judgment of Dismissal of False Claims Actions; and

(g) Reserving jurisdiction over consummation of the settlement, including the award of the *Qui Tam* Plaintiffs' attorneys' fees and expenses.

*Effective Date*

19. The Effective Date shall be the date the District Court enters the Final Judgment of RICO Class Action and Final Judgment of False Claims Action herein. Implementation of those judgments and this Stipulation shall not be delayed unless a stay of implementation is granted by the District Court or an appellate court.

*Administering Claims Of Claimants*

20. For purposes of determining the extent, if any, to which any Proof of Claim shall be entitled to be treated as an Approved Claim pursuant to the Stipulation, the following conditions shall apply:

(a) Each Claimant shall be required to submit a separate Proof of Claim, substantially in the form of Exhibit C or D hereto, signed under penalty of perjury, and supported by such documents as are specified in the Proof of Claim. The Former Ratepayer Proof of Claim shall include a Release of the RICO Defendants And Related Parties as set forth in Exhibit C.

(b) All Proofs of Claim must be delivered or postmarked no later than June 1, 1990, unless such date shall be extended by the District Court. The United States of America and any member of the Ratepayer Class from whom a Proof of Claim is not received within two weeks after June 1, 1990, or such other period as may be ordered by the District Court, shall forever be barred from receiving any payments pursuant to this Stipulation, but will in all

other respects be subject to the provisions of the Stipulation and the Final Judgment of Dismissal of RICO Class Action and Final Judgment of Dismissal of False Claims Action entered in accordance with this Stipulation.

(c) As soon as practicable after the Effective Date, Class Counsel or the Settlement Administrator shall undertake whatever investigation they deem reasonable or necessary to verify, to the extent possible, the accuracy, completeness and validity of the Proofs of Claim. If any Proof of Claim is disallowed in whole or in part for failure to satisfy the requirements set forth in it, Class Counsel or the Settlement Administrator shall provide written notice to the Claimant filing such Proof of Claim and, where appropriate, request the Claimant to complete the Proof of Claim or to file additional proof with such supporting documents as may be reasonably necessary to verify the accuracy and completeness of the Proof of Claim.

21. For purposes of determining the amount of a Claimant's Recognized Losses, a Claimant who submits an Approved Claim shall have a Recognized Loss for each calendar year in which the Claimant occupied an address for which the Claimant made a payment to LILCO for electric utility service.

22. As soon as practicable following the Effective Date and resolution of the validity of all Proofs of Claim, Class Counsel shall submit to the District Court, on notice to all parties:

(a) A proposed order (the "Distribution Order") approving the proposed distribution of the Former Ratepayer Fund and finally barring Claimants asserting any defective or otherwise rejected or subsequently filed Proofs of Claim (i) from participating in the Former Ratepayer Fund, (ii) from claiming against the Former Ratepayer Fund itself, and (iii) from claiming against any person involved in the acceptance or disallowance, verification or calculation, tabulation or other processing of the Proofs of Claim filed, the notification of Claimants as to the disposition of their

Proofs of Claim, the investment or distribution of the Former Ratepayer Fund, or any other aspect of the administration of the Former Ratepayer Fund; and releasing the parties and their agents from any liability in connection with the processing of Proofs of Claim in the distribution of the Former Ratepayer Fund;

(b) A document setting forth the proposed disposition of the Proofs of Claim received and the proposed distribution of the Former Ratepayer Fund including, without limitation, a list of Claimants setting forth the name and address of each Claimant; and

(c) An affidavit setting forth the expenses and legal fees which have been incurred in connection with the administration of the Former Ratepayer Fund as set forth in paragraph 13, which shall be paid out of the Former Ratepayer Fund upon order of the District Court. Class Counsel shall have the right to apply to the District Court for interim payments of fees and expenses incurred in the administration of the Former Ratepayer Fund in advance of the Distribution Date.

23. (a) Upon entry of the Distribution Order and the expiration of time when such order shall no longer be subject to appellate review (the "Distribution Date"), Class Counsel or their designated representatives shall cause the Former Ratepayer Fund, less fees and expenses as set forth in paragraphs 22(c), to be distributed promptly to each Claimant who filed an Approved Claim.

(b) Class Counsel or their duly authorized agent shall take all reasonable steps to maintain all Proofs of Claim received in connection with this litigation until one year after the Distribution Date and shall make such Proofs of Claim available to RICO Defendants' Counsel within ten business days of request therefor. Class Counsel shall advise RICO Defendants' Counsel in writing of the location where such Proofs of Claim are and will be maintained.

(c) Within 60 days of the date that the Former Ratepayer Fund is distributed to Claimants who filed Approved Claims pursuant to the Distribution Order, Class Counsel or their authorized agent shall file with the District Court and serve on counsel for the RICO Defendants a document setting forth the names and addresses of, and the amounts paid to, each distributee of funds from the Former Ratepayer Fund.

### Conditions of Settlement

24. (a) The obligations of the parties hereto to consummate finally the settlement in accordance with this Stipulation are conditioned on the following: (i) approval of a majority of LILCO's shareholders, as set forth in paragraph 12(a) above; (ii) consent, if required pursuant to paragraph 12(b) above, by the United States Attorney for the Eastern District of New York on or before April 1, 1989; (iii) the entry by the District Court of the Final Judgment of Dismissal of RICO Class Action and the Final Judgment of Dismissal of False Claims Action, substantially in the form of Exhibits F and G hereto; (iv) the expiration of the time to appeal from the Final Judgment of Dismissal of RICO Class Action and the Final Judgment of Dismissal of False Claims Action without an appeal having been taken or, if an appeal has been taken, the dismissal of any such appeal and the exhaustion of any further right to judicial review of the final judgments or orders or the affirmances of each judgment and order unmodified in all material respects so as to permit the consummation of the settlement provided for in the Stipulation in accordance with all its terms and provisions, with no further right to appeal or to seek review or rehearing remaining; and (v) the occurrence of the Effective Date.

(b) Subject to the terms and provisions of this Stipulation, Class Counsel, the Government's Counsel, LILCO, or the Individual Defendants shall have the right to terminate the Stipulation if any of the conditions set forth in paragraph 24(a) do not occur.

### Termination Of The Stipulation

25. (a) In the event that this Stipulation is terminated for any reason, this Stipulation shall be deemed null and void, and shall have no further force and effect with

respect to any party in any of the actions affected by the Stipulation and neither the Stipulation, the exhibits thereto, nor the settlement negotiations shall be used or referred to in any such action or in any other actions or proceedings for any purpose.

(b) In the event that the Stipulation is terminated for any reason, written notice shall be provided by the terminating party to the District Court and to the other parties. In the event that this Stipulation is terminated, Class Plaintiffs, Class Counsel, the *Qui Tam* Plaintiffs, and the Government's Counsel shall not be responsible for the costs of the Hearing Notices or any other administrative expenses advanced by LILCO in connection with this settlement, and they shall not be obligated to reimburse any person for such expenses, and LILCO agrees to reimburse Stone & Webster for any monies paid to LILCO pursuant to paragraph 9 of this Stipulation.

(c) In the event of termination of this Stipulation, the RICO Action and the False Claims Action shall thereupon revert forthwith to their respective status prior to the date of the execution of the Stipulation and shall proceed as if the Stipulation and related orders and papers had not been executed. In the event that this Stipulation is terminated as between the RICO Defendants and the Ratepayer Class, the Stipulation as between the RICO Defendants and the Government shall also be terminated unless the RICO Defendants and the Government otherwise agree.

### Releases

26. (a) As of the Effective Date, Class Counsel, on behalf of all members of the Ratepayer Class, hereby release and forever discharge the RICO Defendants And Related Parties from any Settled Ratepayer Claims which any member of the Ratepayer Class had, has, or may have in the future, as defined in paragraph 1(rr) of this Stipulation.

(b) As of the Effective Date, the *Qui Tam* Plaintiffs, on their own behalf and on behalf of the United States of America, hereby release and forever discharge the RICO Defendants And Related Parties from any Settled False Claims Act Claims which *Qui Tam* Plaintiffs and the United States of America had, have, or may in the future have, as defined in paragraph 1(qq) of this Stipulation.

(c) The releasing parties referred to in paragraphs 26(a) and 26(b) each acknowledge in this connection that they may have sustained damage, loss, costs or expense that are presently unknown and unsuspected and that such damage, loss, costs or expenses as may have been sustained may give rise to additional damage, loss, costs or expense in the future, as referred to in paragraphs 1(qq) and 1(rr) of this Stipulation. Nevertheless, the releasing parties referred to in paragraphs 26(a) and 26(b) each acknowledge that the releases have been agreed upon in light of this situation and expressly waive any and all rights which they may have under any other state or federal statute or common law principle.

(d) The releases set forth in this paragraph shall be of no force or effect unless and until the District Court finally approves this Stipulation and the Effective Date occurs.

### Application For Attorneys' Fees and Expenses

27. Class Counsel, the Government's Counsel, and the *Qui Tam* Plaintiffs may apply to the District Court for an award of attorneys' fees, costs and disbursements, including an award to the *Qui Tam* Plaintiffs as provided for pursuant to paragraph 8 of this Stipulation. The LILCO Defendants shall be solely responsible for fees awarded by the District Court to Class Counsel and the Government's Counsel for the services they rendered and the expenses they incurred, and for any award by the District Court to *Qui Tam* Plaintiffs, but the LILCO Defendants' responsibility for all such fees, expenses and awards to Class Counsel, the Government's Counsel and the *Qui Tam* Plaintiffs, and for any award of counsels' fees, expenses, costs and disbursements to Suffolk County and for costs of the Hearing Notices and other costs of administering the settlement advanced by LILCO, shall not exceed $10,-000,000. The LILCO Defendants shall

have the right to oppose any such application. The LILCO Defendants shall not pay Class Counsel, the Government's Counsel, the *Qui Tam* Plaintiffs, or Suffolk County, any part of the fees, costs and disbursements awarded by the District Court prior to the Effective Date.

*Miscellaneous*

28. This Stipulation and settlement are not a concession or admission of wrongdoing or liability by any person, and shall not be used or construed as an admission of any fault, omission, liability or wrongdoing on the part of any party hereto in any statement, release or written document or financial report issued, filed or made. Neither this Stipulation, nor the Exhibits hereto, nor the fact of settlement, nor any settlement negotiations or discussions, nor the judgments entered in the RICO Action and False Claims Action as provided in paragraphs 17 and 18 above, nor any related document shall be offered or received in evidence as an admission, concession, or inference against any party hereto in any proceeding other than such a proceeding as may be necessary to consummate or enforce this Stipulation and the settlement.

29. All counsel and any other person executing this Stipulation and any of the Exhibits hereto or any related settlement documents warrant and represent that they have the full authority to do so.

30. All parties agree to use their best efforts to obtain all approvals necessary and to do all things necessary or helpful to effectuate the Stipulation according to its terms, including the execution of all Exhibits or related documents as soon as possible if such execution is necessary, and counsel for all parties are expressly authorized to enter into changes, modifications, or amendments of the Stipulation and the attached Exhibits which they deem appropriate as long as such changes are in writing and are approved by the District Court except as to such purely ministerial and nonsubstantive changes, modifications or amendments as Class Counsel may determine are necessary and appropriate in connection with administration of the settle-

ment of the RICO Action after the Effective Date.

31. This Stipulation and all Exhibits hereto and any related settlement document shall be governed and interpreted in accordance with the laws of the State of New York, unless otherwise expressly stated in the Exhibit or document.

32. In the event of any dispute or disagreement with respect to the meaning, effect, or interpretation of the Stipulation or an attached Exhibit or in the event of a claimed breach of the Stipulation or an attached Exhibit, the parties hereto agree that such dispute will be adjudicated only in the District Court. The District Court shall retain jurisdiction for the purposes, among other things, of administering this settlement and resolving any dispute hereunder and awarding plaintiffs' counsel attorneys' fees and reimbursing their expenses.

33. This Stipulation and the attached Exhibits represent the entire agreement between the parties hereto, supersede any prior agreements or understandings between the parties with respect to the subject matter hereof (including the Class Settlement Agreement and the Stone & Webster Settlement Agreement), and shall not be modified unless in writing. If there is any inconsistency between this Stipulation and the attached Exhibits, the provisions of this Stipulation shall control.

34. This Stipulation and any of the Exhibits hereto may be amended or modified by a written instrument signed by Class Counsel, the Government's Counsel, and the RICO Defendants' Counsel, with the consent of the District Court, without further notice to the Ratepayer Class unless the District Court requires such notice.

35. This Stipulation and its Exhibits may be executed in one or more actual or telecopied counterparts, all of which together shall be one and the same instrument and all of which shall be considered duplicate originals.

36. Class Counsel and the Government's Counsel shall prepare, and the RICO Defendants' Counsel shall cooperate in presenting, such papers to the District

Court and others as may be necessary to effectuate the purposes and intent of the Stipulation.

37. It is specifically agreed that the District Court may consider and rule upon the fairness, reasonableness and adequacy of the settlement of the RICO Action and the settlement of the False Claims Action independently of any award of fees and disbursements requested by Class Counsel, the Government's Counsel, and the *Qui Tam* Plaintiffs.

38. The Stipulation shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns, and upon any corporation or other entity with which any party hereto may merge or consolidate.

39. The exhibits to the Stipulation are incorporated in and constitute an integral part of the Stipulation.

40. Any headings, subheadings, or titles herein are used for the purpose of convenience only and have no other legal force, meaning or effect.

Dated: New York, New York
February 27, 1989
Vladeck, Waldman, Elias
& Englehard, P.C.
By s/Judith P. Vladeck
A Member of the Firm
1501 Broadway, Suite 800
New York, New York 10036
(212) 354-8330
Attorneys for the Ratepayer
Class
Bower & Gardner
By _____
A Member of the Firm
110 E. 59th Street
New York, New York 1002
(212) 751-2900
Attorneys for the Government
Shea & Gould
By s/Michael Lesch
A Member of the Firm
1251 Avenue of the Americas
New York, New York 10020
(212) 827-3000

Attorneys for the Individual
Defendants
Susan E. Silverman, Esq.
s/Susan E. Silverman
175 East Old Country Road
Hicksville, New York 11801
(516) 933-4529
Attorney for Defendant
Long Island Lighting Company
Mudge Rose Guthrie Alexander
& Ferdon
By s/Lawrence V. Senn, Jr.
A Member of the Firm
180 Maiden Lane
New York, New York 10038
(212) 510-7000
Attorneys for Defendant
Stone & Webster Engineering
Corporation

## APPENDIX A

### AGREEMENT

The parties to this settlement agreement ("Class Settlement") believe that it is in the best interests of their clients as well as in the interests of the people, industry and business on Long Island, to settle this controversy promptly and reasonably. They have carefully considered the difficulties in continuing the litigation and agree that without a settlement the controversy will remain unresolved for years. Although the case has been dismissed, Lilco faces extreme financial risk if the judgment is overturned on appeal. In the meantime, the parties will incur very substantial litigation costs payable by taxpayers, ratepayers and shareholders. At the same time, uncertainty concerning Lilco's financial future while the litigation is pending will greatly increase the cost for Lilco of obtaining funds, thereby increasing costs to ratepayers and weakening the company's financial condition. Accordingly, the parties have agreed to settle this litigation pursuant to the following terms:

1. Lilco shall pay the class a total of $390 million in the form of rate reductions over a period of 10 years. The United States shall receive its proportionate share of the rate reductions as a Lilco ratepayer.

The first rate reduction shall begin in June, 1990. The rate reductions required by this settlement agreement shall be accomplished in accordance with the following schedule:

| | |
|---|---|
| June 1990 | $ 20 Million |
| June 1991 | $ 20 Million |
| June 1992 | $ 20 Million |
| June 1993 | $ 30 Million |
| June 1994 | $ 30 Million |
| June 1995 | $ 40 Million |
| June 1996 | $ 50 Million |
| June 1997 | $ 60 Million |
| June 1998 | $ 60 Million |
| June 1999 | $ 60 Million |

The effect of the rate reductions shall be to reduce rates to Lilco's customers in proportion to the electric rate payments that would otherwise have been made by each ratepayer. The rate reduction shall be an adjustment to individual twelve monthly electric bills. Lilco shall not seek any rate revenue which recovers any portion of the rate reductions. Lilco will not attempt to obtain the sums listed above from the ratepayers.

The above revenue reductions are the total amount that Lilco shall guarantee payment for all purposes covered by this settlement including (a) payments to the United States, any intervenors and class members, and (b) any other expenses of this settlement except attorneys' fees, expenses and costs as described in paragraph 3 below.

2. A $10 million fund will be established for the purpose of satisfying the claims of former Lilco ratepayers, and satisfying the claims of the United States government for reimbursement of electric utility payments paid directly or indirectly, who may no longer be Lilco ratepayers. This $10 million fund will be subtracted from the June, 1990 rate reduction by Lilco described in paragraph 1 of this agreement, and will be distributed to former ratepayers in the year starting June 1, 1990. To the extent reasonably ascertainable, the names and addresses of those who were ratepayers at any time during the period from 1974 to the end of 1989, (and are no longer ratepayers) shall be determined. Each such former ratepayer shall receive, upon submitting an application approved by the court, a proportionate share of a $10 million fund, deposited in an interest bearing account in June 1990. The expenses of the payment to former ratepayers shall be paid out of that account. The United States government shall receive, upon submitting an application approved by the court, a proportionate share of the $10 million fund based upon amounts reimbursed by the United States government to former ratepayers for electric utility costs paid to Lilco.

3. Reasonable attorneys' fees, litigation expenses to attorneys representing the class and the United States and all costs of notice, publication and administration of the class action shall be allocated by the court, but the total amount of attorneys' fees paid to attorneys representing the class, Suffolk County and the United States and other costs and expenses will not exceed $10 million. The attorney fees, costs and expenses shall be paid by Lilco and the individual defendants in addition to the rate reductions described in paragraph 1 of this agreement, and shall be paid pursuant to further order of the court. Lilco and the individual defendants shall have the right to oppose any application for fees, expenses and costs on the ground of reasonableness, subject to final approval by the court.

4. The *qui tam* plaintiffs in the False Claims Act action on behalf of the United States against Lilco shall receive an amount fixed by the court, taking into account the claims asserted under the False Claims Act, payable out of the fund described in paragraph 3 of this agreement.

5. Lilco will recognize a Citizens' Advisory Panel and will provide meeting space and access to Lilco's relevant publicly available technical and financial information. The Panel shall be comprised of representatives from consumer organizations, organizations representing economically disadvantaged Long Islanders, and the Long Island business community to study and advise the company and the public concerning ways to improve service, to mitigate rate increases, to control energy costs, and to assist customers to conserve energy. At least one member of the Panel shall be a

named plaintiff or intervenor, subject to court approval. The period of the Panel's existence shall be five years subject to extension by party agreement.

6. Notice will be promptly given of public fairness hearings to be conducted by the court at times and places selected by the court. Notice will be given by such method as the court shall order, payable from the reasonable attorneys' fees and costs fund described in paragraph 3 above.

7. This agreement does not decide any motions made or to be made by any party not a signatory of this agreement.

8. No inference of liability or lack of liability of any party to the suit shall be drawn by any party to this agreement by virtue of this agreement.

9. This agreement is subject to prompt approval by Lilco's Board of Directors and shareholders and review with respect to the provisions relating to the United States, if he wishes, by the United States Attorney for the Eastern District of New York.

10. The United States will not seek penalties under the False Claims Act.

11. The court will retain continuing jurisdiction over this settlement throughout the implementation of the settlement agreement and rate reduction plan. Upon a showing of good cause, the court shall enter orders in aid of its jurisdiction to further the purposes to be served by this agreement. The parties to this settlement agreement agree that it is in the best interests of Long Island ratepayers for Lilco to return to financial health at the least cost to ratepayers. Any petition for amendment requires notice to counsel for all parties. The Public Service Commission will have the right to be heard before the court orders any modification of the rate reduction plan set forth in paragraph 1 of this agreement.

12. All causes of action arising from the RICO complaint or the False Claims Act complaint are barred to the parties to this agreement.

13. The parties will reduce this agreement to more specific language. In case of disagreement on any specific issues, the court, after hearing the parties, shall decide the specifics to be embodied in any final agreement in accordance with the general tenor of the agreement.

WITNESS

s/Kenneth R. Feinberg
MEDIATOR

s/Anthony F. Early, Jr.
for Long Island Lighting Company
By: s/Michael Lesch
for the individual defendants

s/Judith P. Vladeck
for the Class

s/James D. Harmon, Jr.
for the United States

## APPENDIX B

### SETTLEMENT AGREEMENT

WHEREAS, Stone & Webster Engineering Corporation ("SWEC") had been a defendant in this action; and

WHEREAS, plaintiff the County of Suffolk, voluntarily dismissed its action against SWEC prior to commencement of the jury trial; and

WHEREAS, the class of ratepayers whose claims were severed from those of the County of Suffolk determined it to be in the best interests of the class similarly to dismiss its claims against SWEC,

NOW, THEREFORE the parties to this Settlement Agreement agree to settle all matters in dispute between them on the following terms and conditions:

1. Upon approval of this Settlement by the Court, SWEC shall pay to the Ratepayer Class the sum of $50,000.00 which shall constitute the total amount that SWEC shall pay for any and all purposes under this Settlement Agreement.

2. The foregoing funds shall be used for such purposes and distributed to such persons as the Court may approve.

3. No inference of liability or lack of liability of any party to the action shall be drawn by any party to this agreement by virtue of this agreement.

4. All members of the Ratepayer Class release SWEC from, and are barred from ever asserting against SWEC, any of the claims asserted in, or arising out of the facts asserted in the complaint in this action.

5. This Settlement Agreement shall be the subject of and considered at the Fairness Hearings concerning the settlement agreement between LILCO and the Class to be conducted by the Court at times and places selected by the Court.

Dated: February 19, 1989

s/Laurence V. Senn, Jr.
for Stone & Webster
Engineering Corporation

s/Judith P. Vladeck
for the Class

## APPENDIX C

## INSTRUCTIONS & PROOF OF CLAIM FORM

TO: ALL PERSONS WHO WERE RATEPAYERS OF THE LONG ISLAND LIGHTING COMPANY ("LILCO") AT ANY TIME DURING THE PERIOD JANUARY 1, 1974 THROUGH DECEMBER 31, 1989 AND ARE NO LONGER RATEPAYERS OF LILCO ("FORMER RATEPAYERS"):

IN ORDER TO BE ELIGIBLE TO RECEIVE A PAYMENT AS A MEMBER OF THE RATEPAYER CLASS, YOU MUST SUBMIT A PROOF OF CLAIM FORM POSTMARKED ON OR BEFORE _____, 1990.

Attached to these instructions is a Proof of Claim form for use in connection with the partial settlement of the above class action (the "Class Action"). Please read these instructions carefully to determine your eligibility to participate in the distribution of the Net Settlement Fund. If you are a Former Ratepayer and are otherwise eligible and wish to participate in the Net Settlement Fund, you must complete and sign the Proof of Claim and mail it in accordance with these instructions.

*Basis For Participation*

Your participation in the Net Settlement Fund will be determined in accordance with the provisions of the Stipulation of Settlement of this Class Action on file in the District Court. In summary, each Claimant who submits an Approved Claim shall be entitled to a pro-rata share of the Net Settlement Fund, which is to be established by the payment of $10 million into an interest bearing account in accordance with the terms of the Stipulation of Settlement. Each Claimant who submits an Approved Claim shall be entitled up to a maximum of $20 per year for each year that the Claimant was a ratepayer of LILCO, unless the Claimant submits satisfactory proof that Claimant paid more than $1,000 to LILCO for electric utility service received in any one calendar year. For any year in which a Claimant submits satisfactory proof that the Claimant paid more than $1,000 to LILCO for electric utility service, the Claimant shall be entitled to receive from the Net Settlement Fund a maximum of up to 2% of the Claimant's payments to LILCO for electric utility service. Accordingly, if you have proof that you paid LILCO more than $1,000 for electric utility service in any year from 1974 through 1989 (*e.g.,* LILCO bills, cancelled checks, *etc.*), you should enclose proof of such payments with your Proof of Claim.

Your Proof of Claim must identify (a) each of your addresses as a ratepayer of LILCO between January 1, 1974 and December 31, 1989; and (b) if you are submitting proof of payments to LILCO in excess of $1,000 per year for any year from 1974 through and including 1989, the amount of annual payments that you made to LILCO for electric utility service between January 1, 1974 and December 31, 1989.

*General Instructions For Completion Of Proof Of Claim*

*All* Proofs of Claim must be submitted by persons or entities who were ratepayers of LILCO, or by the legal representatives of such persons or entities.

Executors, administrators, guardians, conservators, and trustees may complete and sign the Proof of Claim on behalf of each person or entity represented by them,

but they must identify each such persons or entity and provide proof of their authority (*e.g.*, powers of attorney or currently effective letters testamentary or letters of administration) to complete and execute the Proof of Claim on the Claimant's behalf. A Proof of Claim submitted by legal representatives of a Claimant must be executed by all such representatives.

All of a Claimant's addresses as a Former Ratepayer during the Class Period must be listed separately in the Proof of Claim. If you cannot list all addresses in the spaces provided in the Proof of Claim, or if you believe that you must supply additional information with respect to any addresses, attach separate sheets to the Proof of Claim providing all the required information. The Claimant must be properly identified on each such additional sheet.

If you claim payments of more than $1,000 to LILCO for electric utility service in any one year, you must attach to the Proof of Claim form the original, or true and correct copies, of LILCO bills, cancelled checks to LILCO, or other satisfactory proof confirming the payments to LILCO as listed in your Proof of Claim.

You must mail the completed Proof of Claim and attachments by first class mail, or registered or certified mail, postage prepaid, *post-marked* no later than _____ _____ 1990, to:

LILCO RICO Litigation
[Address]

We suggest that you retain copies of your Proof of Claim and all supporting documentation.

Any person who knowingly submits a false Proof of Claim is subject to the penalties of perjury.

If you desire additional information or require additional copies of the Proof of Claim, you may obtain such additional information or copies by writing to:

LILCO RICO Litigation
[Address]

Please do not contact the Court or the Clerk's Office for information or copies.

Dated: Brooklyn, New York
_____ —, 1990

Clerk of the Court
United States District Court Eastern District of New York

## PROOF OF CLAIM AND RELEASE
### (Please Print or Type)

_____ (and) _____

declare(s) as follows:
    I.  Identity of Claimant(s):
    Name(s): _____

Current Address: _____
                Street

_____
          City     State        Zip
Telephone: (_____) _____
      Area Code

Name of individual or legal representative to contact in connection with claims made on behalf of legal entities such as corporations, estates, and trusts.

_____

II. Claimant has read and is familiar with the contents of the instructions accompanying this Proof of Claim and understands that reference is made in this Proof of Claim to the Stipulation of Settlement for the matters described and the terms defined therein. Claimant understands that the information set forth below is subject to verification by Class Counsel and by LILCO.

III. Statement of Claim of _____.
(Print Name)

*All* addresses of Claimant as a ratepayer of LILCO must be listed.[1]

A. *Addresses As A LILCO Ratepayer:* During the period from January 1, 1974 through December 31, 1989, inclusive, Claimant, or the person Claimant represents, made payments to LILCO for utility service from the following addresses:

Address: _____

_____

_____ New York

Dates of Occupancy

_____ to _____

Month/Year          Month/Year

Address: _____

_____

_____ New York

Dates of Occupancy

_____ to _____

Month/Year          Month/Year

Address: _____

_____

_____ New York

Dates of Occupancy

_____ to _____

Month/Year          Month/Year

Address: _____

_____

_____ New York

Dates of Occupancy

_____ to _____

Month/Year          Month/Year

B. *Proof Of Payments To LILCO In Excess of $1,000 Per Year.*

THIS SECTION IS OPTIONAL AND SHOULD BE COMPLETED ONLY IF YOUR PAYMENTS TO LILCO FOR ELECTRIC UTILITY SERVICE IN A GIVEN YEAR EXCEEDED $1,000 AND YOU ARE ENCLOSING PROOF OF SUCH PAYMENTS WITH THIS PROOF OF CLAIM.

Claimant encloses proof that Claimant paid LILCO the amounts listed below in excess of $1,000 for utility service for the years indicated:

| Year | Amount |
|------|--------|
| 1974 | _____ |
| 1975 | _____ |

| Year | Amount |
|------|--------|
| 1976 | _____ |
| 1977 | _____ |
| 1978 | _____ |
| 1979 | _____ |
| 1980 | _____ |
| 1981 | _____ |
| 1982 | _____ |
| 1983 | _____ |
| 1984 | _____ |
| 1985 | _____ |
| 1986 | _____ |
| 1987 | _____ |
| 1988 | _____ |
| 1989 | _____ |

IV. Claimant, and the person Claimant represents, if any, submits to the jurisdiction of the United States District Court for

1. A Claimant may duplicate this page for additional addresses.

the Eastern District of New York for purposes of investigation and discovery with respect to this Proof of Claim under the Federal Rules of Civil Procedure, and agrees to be bound by and subject to the terms of the judgment and orders of that Court in the action entitled *County Suffolk v. LILCO*, 87 Civ. 0646 (JBW), and to furnish such additional information or proof with respect to this Proof of Claim as the parties or the District Court shall require.

V. Claimant acknowledges that under the terms of the Stipulation of Settlement, Claimant and/or the person(s) Claimant represents on behalf of themselves and their respective heirs, executors, administrators, successors, assigns, and any persons they represent have released and forever discharged LILCO, Charles R. Pierce, Wilfred O. Uhl, Charles J. Davis, and Andrew W. Wofford (the "Individual Defendants") and Stone & Webster Engineering Corp. ("Stone & Webster") and each of them, and as to LILCO and the Stone & Webster, their respective present and former directors, officers, partners, subsidiaries, parents, affiliates, predecessors or beneficiaries, and as to the Individual Defendants their respective spouses, heirs, executors, administrators, beneficiaries and assigns, and each of them, of and from any and all manner of causes of actions, suits, claims and rights of any nature whatsoever, whether known or unknown, for damages or any other relief, which Claimant had, has or may have in the future, as defined in paragraph 1(rr) of the Stipulation of Settlement, whether based on any state or federal law, based upon or arising from the PSC proceedings complained of or raised, or that might have been complained of or raised, in the RICO Action, the Amended RICO Complaint, or the Ratepayer Claims.

VI. Claimant, or the person Claimant represents, has submitted no other Proof of Claim with respect to the Net Settlement Fund, except the following:

[If none, insert "None." If Claimant or the person Claimant represents has for any reason submitted other Proof of Claim forms herein, give the particulars.]

VII. Claimant has read the foregoing Proof of Claim and knows the contents thereof, and declares under penalty of perjury that the information set forth therein by Claimant and in the documents attached thereto is true and complete to the best of Claimant's knowledge or information and belief.

Date: ____ 1990_____
　　　　　　　　　　　[signature]

Date: ____ 1990_____
　　　　　　　　　　　[signature]

ANY PERSON WHO KNOWINGLY SUBMITS A FALSE PROOF OF CLAIM IS SUBJECT TO PENALTIES FOR PERJURY.

## APPENDIX D

### PROOF OF CLAIM OF THE UNITED STATES OF AMERICA

The United States of America submits this Proof of Claim to participate in the distribution of payments to Former Ratepayers of Long Island Lighting Company ("LILCO") as a result of the settlement of litigation alleging electric rate overcharges from 1974 through 1989.

The United States of America submits this Proof of Claim to establish the amount of payments made by the United States of America to LILCO on behalf of the Former Ratepayer listed below or to the Former Ratepayer of LILCO listed below to reimburse the Former Ratepayer for payments to LILCO for electric utility service.

Name and address of Former Ratepayer of LILCO:

_____

_____

_____

_____

_____

The United States of America certifies that it paid the Former Ratepayer of LILCO identified above the following

amounts in the years indicated to reimburse the Former Ratepayer for payments to LILCO for electric utility service, as shown by the documentation annexed herewith:

| Year | Amount |
|------|--------|
| 1974 | |
| 1975 | |
| 1976 | |
| 1977 | |
| 1978 | |
| 1979 | |
| 1980 | |
| 1981 | |
| 1982 | |
| 1983 | |
| 1984 | |
| 1985 | |
| 1986 | |
| 1987 | |
| 1988 | |
| 1989 | |

I hereby certify that I have read the foregoing Proof of Claim and know the contents thereof, and that the information set forth herein and in the documents annexed hereto is true and correct to the best of my information and belief.

I also certify that the amounts listed in this Proof of Claim do not duplicate amounts set forth by the Former Ratepayer in any proof of claim submitted or to be submitted by the Former Ratepayer on its own behalf. I also certify that I am authorized to submit this Proof of Claim on behalf of the United States of America.

Date ———————, 1990

————————————————
(Signature)

————————————————
Print or Type Name

————————————————
Title

————————————————
Address

————————————————
Address

————————————————
Telephone No.

ATTENTION! ALL FORMER RATEPAYERS OF THE LONG ISLAND LIGHTING COMPANY

SUMMARY NOTICE OF PARTIAL SETTLEMENT OF CLASS ACTION

TO: ALL PERSONS WHO WERE RATEPAYERS OF THE LONG ISLAND LIGHTING COMPANY ("LILCO") AT ANY TIME DURING THE PERIOD JANUARY 1, 1974 THROUGH DECEMBER 31, 1989 AND WHO ARE NO LONGER RATEPAYERS OF LILCO.

PLEASE READ THIS NOTICE CAREFULLY IN ITS ENTIRETY. THIS NOTICE CONCERNS THE SETTLEMENT OF THE ABOVE CLASS ACTION. IF YOU ARE A FORMER RATEPAYER OF LILCO, YOU MAY BE ENTITLED TO RECEIVE A PAYMENT PURSUANT TO THE SETTLEMENT DESCRIBED HEREIN.

You are notified that the District Court has approved a partial settlement of this class action as set forth in a Stipulation of Settlement dated February 27, 1989. Pursuant to the settlement, all persons who were ratepayers of LILCO at any time during the period January 1, 1974 through and including December 31, 1989 and who are no longer ratepayers of LILCO are eligible to apply for payments from a fund, in the total amount of $10 million, established for the benefit of such former ratepayers.

To apply for a payment from the fund, you must submit a Proof of Claim postmarked on or before ———————, 1990. To obtain a Proof of Claim, please send a self-addressed, stamped envelope (——¢ postage) to:

LILCO RICO Litigation

Copies of the stipulation of settlement may be inspected and copied at the Clerk's Office in each of the following United States District Courthouses at the following addresses:

[redacted]

*Brooklyn*
225 Cadman Plaza East
Brooklyn, New York 11201
*Uniondale*
Uniondale Avenue at Hempstead Turnpike
Uniondale, New York 11553
*Hauppauge*
300 Rabro Drive
Hauppauge, New York 11788

Please do not telephone the Clerk's Office or the Long Island Lighting Company.

Dated: Brooklyn, New York

———— —, 1990

Robert C. Heinemann
Clerk of the Court

APPENDIX F

FINAL JUDGMENT AND ORDER OF DISMISSAL OF RICO CLASS ACTION

[Omitted because the court entered its own form of judgment. See 710 F.Supp. 1487 (E.D.N.Y.1989).]

APPENDIX G

FINAL JUDGMENT AND OR ORDER OF DISMISSAL OF FALSE CLAIMS ACTION

[Omitted because the court entered its own form of judgment. See 710 F.Supp. 1485 (E.D.N.Y.1989).]

EXHIBIT 2

GOVERNOR'S PRESS RELEASE AND AGREEMENT DATED FEBRUARY 28, 1989 [Press Release Omitted]

SETTLEMENT AGREEMENT—LILCO ISSUES

The undersigned parties agree that the principles, terms and conditions set forth herein represent a just and reasonable settlement of outstanding issues related to the Long Island Lighting Company (LILCO). By this settlement agreement, LILCO intends to transfer Shoreham to the Long Island Power Authority (LIPA), and the parties intend that LILCO be returned to investment-grade financial condition as an investor-owned electric and gas corporation and that administrative and court litigation concerning Shoreham and other issues be terminated and the settlement of the related RICO and Brookhaven litigations to which the State is not a party be facilitated. The parties agree that this settlement shall be presented to the Public Service Commission of the State of New York (PSC) for its approval. The parties believe that the settlement agreement, taken as a whole, constitutes a prudent course of action for resolving these issues.

Accordingly, the parties agree to the following principles, terms and conditions:

1. When this agreement becomes effective, LILCO shall transfer Shoreham assets to LIPA for $1.00.* LIPA shall close Shoreham and contract for its decommissioning with the New York Power Authority (NYPA). The transfer of Shoreham assets to LIPA shall be made pursuant to the Asset Transfer Agreement, dated as of June 16, 1988, between LILCO and LIPA as amended to reflect that the Settlement Agreement referred to therein shall be this Settlement Agreement and as further amended by mutual agreement of the parties hereto to reflect any further revisions contemplated by this Settlement Agreement or required by the passage of time. LILCO agrees that it will not operate Shoreham pursuant to any authorization to operate Shoreham that may be or has been granted by the Nuclear Regulatory Commission, provided that all approvals except shareowners approval are received by April 15, 1989. If all approvals, except shareowner approval, are received by April 15, 1989, LILCO will not operate Shoreham unless this agreement is disapproved by shareowners. LILCO will use its best efforts to conduct its shareowners meeting by June 15, 1989.

* The parties agree that for approval of this settlement agreement to become effective, the PSC must approve the Asset Transfer Agreement between LILCO and LIPA pursuant to Public Service Law, Section 70. The PSC agrees to review the annual decommissioning budgets identified in Section 5.3 of the Asset Transfer Agreement.

2. It is noted that over the opposition of the Governor, as conveyed by the Executive Director of the Consumer Protection Board, the PSC on February 18, 1989 approved a temporary rate increase of 5.4 percent for a rate year ending March 1, 1990. The parties to this agreement anticipate that the PSC shall ensure that future impacts on subsequent rates are minimized to the maximum extent practicable and shall promptly determine just and reasonable rates for LILCO.

3. The parties herein that are also parties to the litigation currently pending before the United States Court of Appeals for the Second Circuit, entitled *LILCO v. Cuomo, et al.*, agree to stipulate to a discontinuance of the litigation based upon this agreement as soon as practical. The related LILCO motion for attorneys' fees pending before the United States District Court (N.D.N.Y.) will be withdrawn with prejudice. The settlement shall be with prejudice, except that the withdrawal of LILCO's appeal shall be without prejudice and may be reinstated in the event LIPA attempts to acquire an interest in LILCO by any means, including tender offer, merger offer, condemnation or proxy contest. The parties to the LILCO appeal shall consent to any motion by LILCO to preserve its right to prosecute such appeal consistent with the above conditions. The settlement of this litigation shall be contingent upon the effectiveness of this agreement.

4. The parties herein that are also parties to the litigation pending before the Appellate Division of New York State Supreme Court (3rd Dept.), entitled *LILCO v. PSC* (and three other proceedings), agree to stipulate to a discontinuance of the litigation and to submit this agreement and the PSC's decision on this agreement for approval and enforcement, if necessary, as soon as practical to the Supreme Court in settlement of the litigation. The settlement of this litigation shall be contingent upon the effectiveness of this agreement.

5. The parties herein that are also parties to the two actions recently decided (1) by the Appellate Division of the New York State Supreme Court (2d Dept.) entitled *LILCO et ano. v. Mack et al.*, and (2) by the Supreme Court (Nassau County) entitled *LILCO et ano. v. LIPA, et al.*, agree to submit this agreement to the Supreme Court for approval and enforcement, if necessary, in settlement of the two actions as soon as practical. LILCO has or will shortly serve a notice of appeal from the orders in the two actions, but will not otherwise prosecute the appeal except as set forth below. The settlement of the two actions shall be with prejudice except that LILCO shall retain the right to prosecute its appeal challenging the constitutionality of the LIPA Act and the indemnification of LIPA trustees and officers in the event LIPA attempts to acquire an interest in LILCO by any means including tender offer, merger offer, condemnation or proxy contest. LIPA hereby stipulates that by entering into this settlement agreement LILCO has not prejudiced any rights it might otherwise have to prosecute such appeals in the event LIPA attempts to acquire an interest in LILCO as referred to in the preceding sentence. The settlement of the litigation shall be contingent on the effectiveness of this agreement.

6. Upon the effectiveness of this agreement, the following administrative proceedings shall be terminated:

A. Case 29029—Petition of the CPB under PSL § 66(20) concerning LILCO's excess earnings.

B. Cases 28204, 28704—Petitions of LILCO under PSL § 107 to fund its investment in Bokum Resources Corp. (BRC), except that prior PSC authorizations of expenditures in these cases shall remain in effect, unless terminated or extended by the PSC.

C. Case 29301—Petition of the CPB concerning LILCO's expenditures in response to Hurricane Gloria.

The parties agree that all claims and contentions regarding the prudence or disallowance of LILCO expenditures related to the above referenced proceedings, unless

otherwise expressly accounted for in this settlement agreement, are withdrawn with prejudice when the settlement becomes effective.

7. The parties intend that the execution of this agreement will facilitate the settlement of the related so-called RICO litigation and the Brookhaven tax certiorari proceeding. LILCO agrees to use its best efforts in good faith to resolve these matters.

8. The parties acknowledge that the rate approvals contemplated by paragraph 2 will require public hearings.

9. LILCO will cooperate in obtaining any regulatory approval required to effectuate this agreement and the transactions that it contemplates including the transfer of Shoreham to LIPA, the decommissioning of the Shoreham plant as promptly as possible, and, pending such decommissioning, the maintenance of the Shoreham plant at least cost.

10. LILCO agrees to implement in a timely and complete manner the management audit recommendations from two completed or ongoing management audits directed by the PSC. First, LILCO agrees to implement the recommendations contained in the "Comprehensive Management Audit Report—Long Island Lighting Company," performed by Arthur Young & Co., dated August 1987, excluding recommendations concerning Shoreham nuclear operations, as directed by the PSC. In addition, LILCO shall assign top priority to the 51 non-Shoreham recommendations contained in Section I (Executive Summary) of such report. Second, LILCO shall cooperate in the completion of, and, unless otherwise authorized by the PSC, implement all recommendations to be contained in the final report of "An Operational Audit Report on Long Island Lighting Company's Energy Conservation and Load Management Program," dated June 1988 and prepared by the Office of Utility Efficiency & Productivity of the Department of Public Service. In particular, LILCO agrees that senior management will direct and carefully monitor its energy conservation and load management program, including establishment of goals and objectives, program and project development, and project management implementation, performance and assessment.

11. The Memorandum of Understanding Concerning Proposed Agreements on Power Supply on Long Island between the New York Power Authority (NYPA) and LILCO is incorporated by reference. The parties request that the PSC expressly agree that, within three months of submission, it shall review and act on any agreement for the effectuation of a project referred to in the Memorandum submitted for the purpose of obtaining PSC approval of LILCO's commitments to make payments to NYPA for such project. The parties agree to take steps necessary to implement the Memorandum. In particular, New York State agrees to make available a sufficient amount of the State IDB volume cap to finance the projects covered in paragraph III of the Memorandum. In addition, LILCO will consult with and seek the advice of LIPA in developing a comprehensive least cost power supply plan. LILCO will also consult with LIPA in formulating its requests to the New York Power Authority (NYPA) for gas turbines, base load facilities and allocations of transmission facilities, pursuant to the Memorandum of Understanding Concerning Proposed Agreements on Power Supply on Long Island between NYPA and LILCO. LIPA's consent to NYPA's construction of the facilities contemplated in the Memorandum is hereby conferred.

12. It is specifically understood and agreed that this settlement agreement represents a negotiated agreement, and except as otherwise expressly provided for herein, is intended to be binding only as to the matters specifically addressed herein. No party shall be deemed to have approved, agreed to or consented to any principle or methodology underlying or supposed to underlie the agreement herein, except as otherwise expressly stated.

13. Consistent with applicable law the parties agree to support an allocation to LILCO of a minimum of $100,000,000 per year of the New York State IDB cap for a minimum of 5 years.

14. This agreement will become effective only upon:

A. approval of this agreement and the Asset Transfer Agreement, as amended, by the PSC without modification;

B. approval by the board of directors of LILCO;

C. approval by a majority of the shareholders of LILCO;

D. approval of this settlement by the LIPA trustees; and

E. approval of this settlement by the NYPA trustees.

The above approvals are those necessary for the settlement agreement to become effective, as referred to in paragraphs 1, 3, 4, 5 and 6 above.

15. This agreement may be executed in several counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

16. The following parties accept this agreement

Long Island Lighting Company
By: Russell C. Youngdahl
        President

New York State
By: Governor Mario M. Cuomo
Dated: February 28, 1989